**COMMONWEALTH of Pennsylvania,**
**Appellee**

**v.**

**Randal R. RUSHING, Appellant.**

Superior Court of Pennsylvania.

Submitted April 2, 2012.

Filed June 28, 2013.

Robert M. Buttner, Scranton, for appellant.

Lisa A. Swift, Assistant District Attorney, Scranton, for Commonwealth, appellee.

BEFORE: STEVENS, P.J., BOWES, and STRASSBURGER,* JJ.

OPINION BY BOWES, J.:

Randal R. Rushing appeals from the judgment of sentence of three consecutive life sentences plus forty-three years and nine months to eighty-seven years and six months incarceration imposed by the trial court. Appellant was convicted of three counts each of first-degree murder, second-degree murder, and third-degree murder in connection with the killings of three individuals. He also was adjudicated guilty of multiple counts of kidnapping and robbery, and one count of indecent assault. After careful review, we affirm each of Appellant's convictions for first-degree and third-degree murder as well as each count of robbery, and indecent assault. However, we reverse his convictions for kidnapping and second-degree murder and vacate Appellant's judgment of sentence as to the kidnapping convictions.[1]

---

* Retired Senior Judge assigned to the Superior Court.

1. The Commonwealth charged Appellant with second-degree murder based on the commission of kidnapping and did not rely on the robbery charges as the underlying felonies. The court sentenced Appellant to three consecutive ten-to-twenty-year terms of imprisonment for kidnapping and did not impose any sentence on the felony murder convictions.

Appellant, on July 17, 2008, brutally attacked and killed Justin Berrios, Leslie Collier and Dustin Hintz at the Collier/Hintz home. Justin was twenty-years old, Leslie was sixteen, and Dustin was twenty-two. At the time, Appellant resided with Cynthia Collier, who was Leslie and Dustin's mother, and Wes Collier, who was Leslie's father and Dustin's stepfather. Also living in the home were nineteen-year-old Samantha Hintz, Appellant's former girlfriend and a sister to Leslie and Dustin, twenty-year-old Matthew Collier, the brother of two of the victims, and Tristan Berrios, the two-year-old son of Samantha. Justin Berrios was Samantha's former boyfriend and the father of her son. Justin was at the Collier/Hintz home at the time of the crimes.

After stabbing Justin to death, Appellant attacked Leslie, a male, between 4:00 and 4:30 a.m. Following the attack, Leslie managed to awaken his mother, Cynthia, and told her to call 911. According to Cynthia, Leslie was bleeding profusely and covered from his neck to his feet in blood. Cynthia ran into the kitchen to call 911 from the home phone and began to yell for the telephone when she discovered that it was not in the kitchen. Dustin, hearing his mother, ran up from the basement while his mother retrieved her cell phone. Dustin helped his brother to the floor in a hallway when Appellant appeared with a gun and pointed it at Dustin and ordered everyone onto the floor, threatening to kill them if they did not obey. Cynthia asked Appellant what he was doing to which he responded, "I'm giving Samantha something she'll remember." N.T., 9/27/10, at 185. Appellant then took Leslie into the kitchen before returning and directing Cynthia to her son Matthew's room. Matthew is handicapped and unable to walk. Cynthia complied with Appellant's directive and he handcuffed her hands behind her back. Appellant then ordered Dustin into his mother's bedroom. Cynthia stated that she could hear Appellant hitting Dustin. Subsequently, Appellant re-entered Matthew's room and placed a gun against Cynthia's head and demanded that she "shut the fuck up" or he would kill her. *Id.* at 193. At this point, he tied Matthew's hands with a shirt and his feet with a computer cable.

Appellant then left the bedroom and began to walk up and down the stairs of the house before re-entering the bedroom where he had forced Dustin. Cynthia stated that she observed Appellant select a red hammer from a toolbox in that room and began to hit Dustin. Dustin died of massive blunt force trauma to the head. Afterward, Appellant showered and came back into Matthew's room. He asked Matthew and Cynthia for their bank cards and pin numbers. Both Matthew and Cynthia told him where to find their respective cards and gave him their pin numbers. Appellant also took Cynthia's anniversary ring.

Samantha Hintz arrived home at approximately 5:40 a.m. and was greeted by Appellant who offered to help carry groceries. Appellant then told Samantha that he had a surprise for her and told her to go to her son's room. Samantha checked on her son, and Appellant instructed her to go to her bedroom. After entering her bedroom, Appellant shoved her onto her

---

Of course, the court was foreclosed from sentencing on both crimes due to the merger doctrine. Additionally, since Appellant has been sentenced to three consecutive life sentences, we find that vacating his kidnapping sentence will not, in practice, affect the overall sentence imposed. Thus, our decision does not result in altering the overall sentence Appellant will serve and there is no need to remand. *Commonwealth v. Lomax*, 8 A.3d 1264 (Pa.Super.2010); *Commonwealth v. Thur*, 906 A.2d 552 (Pa.Super.2006).

bed, but she resisted and asked where Justin Berrios was located. Appellant lifted up a sheet and displayed the dead body of Justin, who was laying next to the bed. Justin had been stabbed fourteen times including seven stab wounds to the neck. Appellant then attempted to get Samantha onto her stomach on the bed. Samantha struggled with Appellant and he threatened her with a gun. Next, Appellant tied Samantha's hands with a necktie and her feet with a belt and left the room before returning again. Appellant took Samantha's cell phone and looked through her call list before throwing the phone onto Justin's body. He then climbed on top of Samantha, kissing her and telling her that he loved her.

Thereafter, Appellant removed Samantha's bank card and cash from her purse and exited the bedroom. Appellant, however, returned and said that he should rape Samantha. He sat next to her on her bed and placed his hand inside of her shirt and grabbed her breast as well as giving her a hickey on her neck. Subsequently, he took her car keys and told her that if he was not back in a half-hour that she could do whatever. Before leaving, he remarked that his killing spree was not yet complete. At some point, Appellant also entered Matthew's room and told Matthew and Cynthia that Wes Collier would be the next person in the house and that they could yell for help when he arrived home from work. However, he then stated, "fuck it, it's six o'clock now. If I ain't back by 6:30 you guys can do whatever the hell you want." *Id.* at 209.

Samantha was eventually able to dial 911 on her cell phone with her toe. Police arrived at approximately 6:53 a.m. and found Samantha, Cynthia, and Matthew still bound. Leslie was dead in the blood-soaked kitchen. Bloody clothes were located in the basement of the home and various knives and three bloody hammers were also found. Police recovered bloody socks in the kitchen and blood was identified in the bathroom on the bath tub, a rug, and wash cloth. Missing from the home were four game systems, various video games, and jewelry.

In order to locate Appellant, police sought a court order to ping Appellant's cellular phone and find his approximate position via real time cell site location information. Detective Chris Kolarchno defined pinging at the suppression hearing as determining the real time location of the cell phone by looking at the cell signal between the phone and the closest cell tower and finding the last known address where the cell phone transmitted a signal requesting service. N.T., 8/13/09, 102–103. Detective Kolarchno stated that police also used the cell phone's GPS system to find Appellant. *Id.* at 104.

The Court of Common Pleas issued an order and police tracked Appellant to a street in Wilkes Barre, Pennsylvania. Police were able to fix the location of Appellant's phone within 98 meters or approximately 300 feet. Police determined Appellant's precise location after observing Samantha's stolen car outside of a residence and interviewing two individuals who exited that home. Law enforcement secured a search warrant and Appellant was arrested. Police discovered the Wii and a Playstation game system owned by the Colliers in that house as well as a gun with traces of blood on it. In addition, Samantha's vehicle contained Cynthia and Matthew's bank cards.

Appellant was transported to the Scranton Police Department and placed in a holding cell at approximately 4:30 p.m. Since Appellant's socks and shoes were considered evidence, they were confiscated. After viewing the news of Appellant's arrest, Attorney Paul Walker of the Lack-

awanna County Public Defender's Office called the district attorney and asked him not to interview Appellant. At 7:00 p.m., Attorney Walker arrived at the police station and repeated his request that Appellant not be interviewed and asked to see Appellant. Officer Todd Garvey informed Assistant District Attorney Eugene Talerico, who was present at the police station, of Attorney Walker's wishes, but he was not permitted to speak with Appellant.

Detective James Pappas interviewed Appellant around 7:30 p.m. He did not inform Appellant that an attorney had appeared and asked to speak to him. Detective Pappas asked Appellant if he would speak to him and Appellant indicated that he would discuss the matter if he could have a pair of socks. Detective Pappas provided Appellant with a pair of hospital booties and read him his *Miranda* rights. Appellant initialed a *Miranda* waiver form after Detective Pappas wrote in Appellant's answers to the questions waiving his right to counsel and right to remain silent. Appellant admitted to hurting the individuals in the Collier/Hintz house but claimed that he did not remember what happened. Detective Pappas asked Appellant if he believed in God and told him that now was the time to ask for forgiveness. He also confronted him with photographs of the murder victims. Ultimately, Appellant confessed.

The Commonwealth initially proceeded with this matter as a capital murder case and the court appointed multiple attorneys, including two private attorneys, to aid in Appellant's defense. Appellant sought to suppress both his confession and the evidence collected as a result of finding Appellant via the pinging of his cell phone. The trial court denied Appellant's suppression motion, concluding that Appellant's confession was not coerced and exigent circumstances existed to negate any warrant requirement for the pinging. There-after, Appellant agreed to proceed with a non-jury trial in exchange for the Commonwealth's agreement not to seek the death penalty. Following Appellant's non-jury trial, the court convicted Appellant of the aforementioned crimes.

The court sentenced Appellant to three consecutive life sentences for the first-degree murder counts and imposed an aggregate sentence of forty-three years and nine months to eighty-seven years and six months on the kidnapping, robbery, and indecent assault charges. Trial counsel filed post-sentence motions, which the court denied on February 1, 2011. The trial court also granted trial counsel's motion to withdraw and appointed the public defender to represent him on appeal. The Public Defender's Office requested that outside appellate counsel be appointed and the court appointed current counsel. Appellate counsel did not receive his appointment until thirty-one days after the denial of Appellant's post-sentence motion. He therefore filed a PCRA petition seeking the reinstatement of Appellant's direct appeal rights. The court reinstated Appellant's appellate rights *nunc pro tunc* and this appeal ensued. The court directed Appellant to file and serve a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Appellant complied and the court filed a Pa.R.A.P. 1925(a) decision. The matter is now ready for our review. Appellant raises the following issues for this Court's consideration.

1. Did the Trial Court err and/or abuse its discretion in failing to suppress Defendant's statements taken by law enforcement which were obtained in violation of the Defendant's rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article 1, sections 8 and 9 of the Pennsylvania Constitution?

2. Did the Trial Court err and/or abuse its discretion in failing to suppress all evidence, as fruit of the poisonous tree, resulting from interception of the Defendant's cellphone signal in that in [sic] the interception and seizure were in violation of the Defendant's rights pursuant to the Fourth and Fourteenth Amendments of the United States Constitution and Article 1, section 8 of the Pennsylvania Constitution because the application/petition, seeking such information, did not comply with the procedural safeguards of the Pennsylvania Wiretap Act and failed to set forth specific and articulable facts to justify the intrusion and seizure?

3. Did the Trial Court err and/or abuse its discretion in failing to arrest judgment on all charges of kidnapping when the Commonwealth failed to present sufficient evidence to sustain their burden of proof as to each element of the crimes as charged?

4. Did the Trial Court err and/or abuse its discretion in failing to arrest judgment on all charges of second degree murder when the Commonwealth failed to present sufficient evidence to sustain their burden of proof as to each element of the crimes as charged?

5. Did the Trial Court err· and/or abuse its discretion in admitting, over objection of counsel, the testimony of Samantha Hintz, DePatrick Bogle, and Heberto Pena, regarding purported jealous tendencies of the Defendant toward DePatrick Bogle, Damion Cruz and Christian Flores and the Defendant's alleged desire to fight with DePatrick Bogle in that the same constituted inadmissible prior wrong and bad acts evidence with no evidentiary exception and was irrelevant to the case?

Appellant's brief at 4. ·.

### Part I(a)

■ Appellant's initial challenge is to the court's suppression ruling regarding his statements to law enforcement. Appellant's argument gives rise to separate inquiries: first, whether his *Miranda* waiver was knowing, intelligent, and voluntary; second, if his confession and statements to police were knowing, intelligent, and voluntary. "[W]hether a confession is constitutionally admissible is a question of law and subject to plenary review." *In re T.B.*, 11 A.3d 500, 505 (Pa.Super.2010) citing *Commonwealth v. Carter*, 855 A.2d 885, 890 (Pa.Super.2004) and *Commonwealth v. Nester*, 551 Pa. 157, 709 A.2d 879 (1998).

Appellant first argues that his *Miranda* waiver was invalid. He sets forth that·he was placed in a holding cell with a cold concrete floor for three hours without any socks or shoes. In addition, he asserts that he was held in custody for one hour prior to being placed in the holding cell. According to Appellant, police did not provide him with food or drink or permit him to .use the bathroom. Appellant posits that he only offered to give a statement in exchange for socks and shoes. Additionally, Appellant contends that he did not read the *Miranda* waiver form himself and that Detective Pappas read. the form to him. He also points out that it was Detective Pappas who wrote "yes" next to the questions on the *Miranda* waiver form.

The Commonwealth replies that Appellant's *Miranda* waiver was voluntary and that police did not coerce him into confessing. In marshaling its position, the Commonwealth maintains that Detective Pappas asked Appellant if he would talk with him and Appellant said that he would

if he could have a pair of socks. After Detective Pappas provided Appellant with hospital booties, Appellant was taken to an interview room and read his *Miranda* warnings. Detective Pappas read the form *verbatim* and instructed Appellant to stop him and ask him any questions that he may have regarding his rights. According to Detective Pappas, Appellant did not ask him any questions and said that he understood the questions contained in the *Miranda* waiver. At no point did Appellant request an attorney. Further, Appellant was given the form to read and initialed and signed the *Miranda* waiver after reviewing it. Based on these facts, the Commonwealth contends that Appellant's waiver of his Fifth Amendment right to counsel and right to remain silent were constitutionally firm.

As we stated in *In re T.B.*:

this Court does not, nor is it required to, defer to the suppression court's legal conclusions that a confession or *Miranda* waiver was knowing or voluntary. Instead, we examine the record to determine if it supports the suppression court's findings of fact and if those facts support the conclusion that, as a matter of law, Appellant knowingly and intelligently waived his *Miranda* rights....

Regardless of whether a waiver of *Miranda* is voluntary, the Commonwealth must prove by a preponderance of the evidence that the waiver is also *knowing and intelligent.*

*Miranda* holds that the defendant may waive effectuation of the rights conveyed in the warnings provided the waiver is made voluntarily, knowingly and intelligently. The inquiry has two distinct dimensions. First[,] the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation,

coercion or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that *Miranda* rights have been waived.

*In re T.B., supra* at 505–506 (internal citations and quotations omitted) (emphasis in original).

Initially, we find that the placement of Appellant in a holding cell for three hours without any socks or shoes does not invalidate his waiver as it does not rise to the level of coercion. Appellant's waiver could not be the result of coercion based on any alleged withholding of socks and shoes where police did not in any manner threaten him, act threatening, or indicate that speaking to them was a prerequisite to obtaining covering for his feet. Therefore, we conclude that this aspect of Appellant's argument is meritless.

### Part I(b)

Next, Appellant argues that the suppression court erred in failing to find his waiver of his *Miranda* rights was invalid because Attorney Paul Walker of the Lackawanna County Public Defender's Office presented himself at the Scranton Police Department and asked to speak with Appellant, but was prohibited. Attorney Walker also had contacted the district attorney and requested that police not interview Appellant without him being present. The desk officer at the Scranton police station relayed Attorney Walker's presence to the assistant district attorney at the police station. Attorney Walker was informed that the assistant district attor-

ney would talk to him soon. However, after remaining at the station for an extended period without gaining access to Appellant, Attorney Walker left. He later received a telephone call from the assistant district attorney indicating that Appellant already had been interviewed. Police did not inform Appellant of Attorney Walker's presence or attempts to speak with him.

In regards to Appellant's argument pertaining to Attorney Walker's appearance at the police station, the Commonwealth contends that because Appellant never requested an attorney and Attorney Walker was not retained by Appellant, no constitutional violation occurred. The Commonwealth argues, "the presence or absence of an attorney in the police station is irrelevant to [Appellant's] waiver of his *Miranda* rights." Commonwealth's brief at 15.

■ This Court's standard of review in addressing a challenge to the denial of a motion to suppress is

> limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole.

*Commonwealth v. McAdoo*, 46 A.3d 781, 783–84 (Pa.Super.2012).

■ We begin our resolution by examining *Moran v. Burbine*, 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). In *Moran*, the defendant was informed of his *Miranda* rights and executed several written waivers before confessing to murdering a young woman. The defendant did not request an attorney, but while he was in custody, his sister attempted to hire an attorney on his behalf. The attorney contacted police and was told that the defendant would not be questioned until the following day. However, the defendant was questioned that same day and confessed. The Supreme Court held that an accused's decision to waive his right to remain silent does not become involuntary, unintelligent, or unknowing because, unbeknownst to him, an attorney desires to speak with him. As the United States Supreme Court opined in *Moran*,

> whether intentional or inadvertent, the state of mind of the police is irrelevant to the question of the intelligence and voluntariness of respondent's election to abandon his rights.... Granting that the "deliberate or reckless" withholding of information is objectionable as a matter of ethics, such conduct is only relevant to the constitutional validity of a waiver if it deprives a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them. Because respondent's voluntary decision to speak was made with full awareness and comprehension of all the information *Miranda* requires the police to convey, the waivers were valid.

*Id.* at 423–424, 106 S.Ct. 1135.

In *Commonwealth v. Arroyo*, 555 Pa. 125, 723 A.2d 162 (1999), our Supreme Court reasoned that the right against self-incrimination under the Pennsylvania Constitution, found in Article I, Section 9, affords the same protection as its corresponding federal provision, the Fifth Amendment. *Id.* at 166–167. Hence, Appellant is not entitled to greater protections under the Pennsylvania Constitution in regards to any perceived violation of *Miranda*. We find that *Arroyo* is controlling and precludes relief.

In *Arroyo*, the defendant therein and his girlfriend, Pamela Shenk, arrived at police barracks to be interviewed about the death of Shenk's eight-month-old son. The defendant was told that he was free to leave at any time and was not under arrest. Police read the defendant his *Miranda* warnings and he signed a waiver form. The defendant eventually admitted to striking the child in the chest and stomach. During this interview, an attorney whom Shenk had called from the police barracks telephoned police and asked to speak with the defendant to determine if he wanted counsel. The attorney was not permitted to speak with the defendant. The defendant argued that the police's failure to inform him that an attorney was attempting to talk to him vitiated his *Miranda* waiver. Relying on *Moran, supra,* our Supreme Court found that the police action did not violate the defendant's constitutional right against self-incrimination.

We also observe that the Fifth Amendment right to counsel is a personal right which can only be invoked by the person holding that right. Accordingly, whether an attorney physically appears in an attempt to represent the accused does not alter the fact that it is the accused who must invoke his Fifth Amendment right to counsel. Certainly, the presence of an attorney, coupled with any misstatements made by police regarding the ability to speak with a lawyer, could affect a defendant's voluntary, intelligent, and knowing waiver of his *Miranda* rights. Nonetheless, there is nothing in the present record that indicates in any manner that Appellant's *Miranda* waiver was anything less than knowing, intelligent, and voluntary. Police did not inform Appellant that he could not speak with a lawyer or that an attorney did not want to speak with him.

Simply put, Appellant was aware of his constitutional right to consult with a lawyer and exercised his right to speak to police without an attorney. Since Appellant never invoked his right to counsel, the fact that an attorney appeared at the police station and that his interview took place while counsel attempted to speak with him does not establish a *Miranda* violation.

We are cognizant that other jurisdictions have concluded that police action in refusing to allow an attorney access to a client can vitiate a *Miranda* waiver. *See Commonwealth v. McNulty,* 458 Mass. 305, 937 N.E.2d 16 (2010); *Commonwealth v. Vao Sok,* 435 Mass. 743, 761 N.E.2d 923 (2002); *Commonwealth v. Mavredakis,* 430 Mass. 848, 725 N.E.2d 169 (2000); *State v. Roache,* 148 N.H. 45, 803 A.2d 572, 579 (2002); *Dennis v. State,* 990 P.2d 277 (Okla.Crim.App.1999); *People v. Bender,* 452 Mich. 594, 551 N.W.2d 71 (1996); *State ex rel. Juvenile Dept. of Lincoln County v. Cook,* 138 Or.App. 401, 909 P.2d 202 (1996); *State v. Simonsen,* 319 Or. 510, 878 P.2d 409 (1994); *State v. Haynes,* 288 Or. 59, 602 P.2d 272 (1979); *People v. McCauley,* 163 Ill.2d 414, 206 Ill.Dec. 671, 645 N.E.2d 923 (1994); *State v. Reed,* 133 N.J. 237, 627 A.2d 630 (1993); *Bryan v. State,* 571 A.2d 170 (Del.1990); *State v. Stoddard,* 206 Conn. 157, 537 A.2d 446 (1988) (under totality of circumstances *Miranda* waiver may be involuntary where counsel is denied access to client); *Roeder v. State,* 768 S.W.2d 745 (Tex.App.Hous.1988); KY. R.Crim.P. 2.14(2); *see also Moran v. Burbine, supra* at 441 n. 10, 106 S.Ct. 1135 (Stevens, J. dissenting) (collecting cases). However, in virtually all of these cases, the lawyer was actually retained for the defendant by someone acting on the defendant's behalf, such as a family member. In contrast to many of the cases cited above,

counsel herein was never retained.[2] Hence, we conclude that the suppression court did not err in failing to suppress the confession on this basis.

*Part I(c)*

Appellant also argues that, in addition to his *Miranda* waiver being invalid, his confession was involuntary as a result of emotional and psychological coercion. The coercive methods allegedly included aggressively accusing Appellant of lying and appealing to Appellant to ask for forgiveness from God since he could not hide his actions from God. Appellant submits that the totality of the circumstances rendered his confession unlawfully coerced. The Commonwealth asserts that there is no evidence that Appellant was physically or emotionally coerced. The Commonwealth acknowledges that Detective Pappas asked Appellant if he believed in God and to tell the truth to relieve himself of the burden he was carrying as well as to benefit Cynthia Collier.

We hold that Detective Pappas's references to God and showing pictures of the victims to Appellant do not warrant a conclusion that Appellant's confession was involuntarily entered. In ascertaining the voluntariness of a confession, we examine the totality of the circumstances surrounding the confession.

*Nester, supra* at 882. "The question of voluntariness is not whether the defendant would have confessed without interrogation, but whether the interrogation was so manipulative or coercive that it deprived the defendant of his ability to make a free and unconstrained decision to confess." *Id.* In analyzing the voluntariness of a confession under the totality of circumstances standard, "a court should look at the following factors: the duration and means of the interrogation; the physical and psychological state of the accused; the conditions attendant to the detention; the attitude of the interrogator; and any and all other factors that could drain a person's ability to withstand suggestion and coercion." *Id.*

Neither party refers to any case law in this Commonwealth discussing the possible potential coercive effect of appealing to a suspect's religious beliefs. However, we find guidance in our sister states. In *Harden v. State*, 59 So.3d 594 (Miss.2011), a thirty-four-year-old defendant was convicted of the statutory rape of his step-daughter after he confessed. The Mississippi Supreme Court found that a police interview referencing spiritual matters did not render the confession invalid. Specifically, the interview transpired as follows.

Q: Do you believe in God?

---

**2.** Additionally, no Sixth Amendment or Article 1, Section 9 violation of the right to counsel occurred since that right had not yet attached. *See Commonwealth v. Arroyo*, 555 Pa. 125, 723 A.2d 162 (1999); *Commonwealth v. Reed*, 42 A.3d 314 (Pa.Super.2012) (discussing difference between Fifth Amendment and Sixth Amendment right to counsel). Nevertheless, we do acknowledge that our Supreme Court has not foreclosed the possibility of a due process violation occurring under facts similar to the instant case. In *Arroyo*, the Court noted that the appellant's state due process violation claim was "hopelessly intertwined with his argument that his right to counsel was denied." *Id.* at 167. According-

ly, it did not analyze that aspect of the appellant's claim, opining that it would not make the appellant's arguments for him. *Id.* Hence, it appears that our Supreme Court has not eliminated the possibility that a due process violation could occur under similar circumstances. *See also Moran v. Burbine*, 475 U.S. 412, 432, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986) ("on facts more egregious than those presented here police deception might rise to a level of a due process violation."). Herein, Appellant does not make any separate due process argument relative to his position. Therefore, as our Supreme Court did in *Arroyo*, we decline to make Appellant's argument for him.

A: Yeah, I believe in God.

Q: Okay, do you believe God forgives all?

A: Yeah, He forgives all.

Q: He does forgive all, doesn't He? No matter what your sins are, he forgives you doesn't He? But do you not also have to accept responsibility, as hard as it is for you right now? As a man, you need to step forward and accept forgiveness. But that forgiveness is not given easily. You have to meet half-way don't you? Right? And the only way is for you to accept responsibility, for you to admit your weakness....

*Id.* at 605–606. The detective also informed the defendant that the truth would be revealed through the investigation. The Mississippi High Court opined that the detective encouraged the defendant to admit his actions, but did not tell him that he would be forgiven by the criminal justice system. The court concluded that, based on the totality of circumstances, the religious overtones in the interrogation did not result in a coerced confession.

In *Heard v. State*, 287 Ga. 554, 697 S.E.2d 811 (2010), the Georgia Supreme Court held that a detective's confirming of a murder suspect's belief in God and knowledge of the Ten Commandments and calling murder a mortal sin did not render the defendant's confession involuntary. The court noted, "religious remarks are viewed as only one part of the totality of the circumstances and are held not to be coercive." *Id.* at 816 (citing *Rodgers v. Commonwealth*, 227 Va. 605, 318 S.E.2d 298, 304 (1984) and *State v. Johnson*, 207 S.W.3d 24, 45(III)(E)(3) (Mo.2006)).

In *State v. Saint*, 284 S.W.3d 340, 343–346 (Tenn.Crim.App.2008), the Tennessee intermediate appellate court determined that far more extensive religious references did not render a confession to a sex crime invalid. Therein, police interviewed

the defendant on two prior occasions. During his third interview, police resorted to extensive discussion of religious matters with the accused. Among other things, the detectives stated that the victim prayed that the defendant would not touch her and that God did not believe the defendant's story that he committed the inappropriate sex acts while sleeping. They also related that the defendant had been controlled by a demon when he touched his step-daughter.

The Tennessee Court acknowledged that religious references in an interrogation setting had coercive potential, but did not "mandate a *per se* bar against contextual discussions of religion." *Id.* at 346 (citing *State v. Newell*, 212 Ariz. 389, 132 P.3d 833, 844 (2006) ("Appeals to religion do not render confessions involuntary unless they lead to the suspect's will being overborne.") and *State v. Hill*, 361 S.C. 297, 604 S.E.2d 696, 701 (2004)). The *Saint* Court concluded that, based on the totality of circumstances, there was "no evidence that the religious references had any actual coercive effect on the defendant and that his will was overborne, prompting a confession that would not have occurred otherwise." *Id.* at 346.

Instantly, Detective Pappas testified that he asked Appellant, "if he was a religious man, if he believed in God, and told him that now is the time to ask for forgiveness because of his judgment day when he is standing in front of God that he's not going to be able to hide behind the statements that he didn't remember." N.T., 8/13/09, at 49. Detective Pappas then asked Appellant to lift that burden off himself. The detective added,

I told him that he could sit in front of me all he wanted and repeatedly tell me he doesn't remember what happened in that house. He could repeatedly say it's

a blur and fail to provide specific details of his involvement in the heinous act. I then told him that on judgment day when he is standing in front of God, he wouldn't be able to hide behind the statements as God knows all.

*Id.* at 73–74. We find that the detective's imploring Appellant to be truthful by referencing God does not render his confession involuntary. Appellant was twenty-five years old with a twelfth-grade education when interviewed. The evidence of record establishes that the attitude of his interrogators was not threatening and his interrogation took place over approximately three hours. Repeatedly asking an accused to be truthful without implying or making direct promises or threats to the person does not result in a coerced confession. Thus, we reject this portion of Appellant's argument. Insofar as Appellant claims that showing him pictures of the victims was coercive, we find that position untenable.

### Part II(a)

The second issue Appellant levels on appeal presents a matter of first impression in this Commonwealth, although the federal courts have addressed the question with conflicting results. Appellant contends that the real time interception of his cell phone signal violates his Fourth Amendment rights as incorporated by the Fourteenth Amendment as well as his Article I, Section 8 Pennsylvania Constitutional right against unreasonable searches and the Pennsylvania Wiretap Act. Specifically, Appellant maintains that under both our constitutional case law and the Wiretap Act, the Commonwealth was required to secure a search warrant or court order based on probable cause to intercept his cell phone signal. In this case, police secured a court order based on specific and articulable facts pursuant to a prior version of the Wiretap Act[3] and thereafter were able to narrow Appellant's location to within 300 feet on High Street, in Wilkes-Barre, Pennsylvania, by using real time rather than stored data.

We conclude, for the reasons that follow, that a search warrant was not required, that the then applicable Wiretap Act did not apply, and that the Commonwealth possessed both probable cause and exigent circumstances to conduct the warrantless search herein.

The Fourth Amendment to the United States Constitution protects "the right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures[.]" U.S. Const. Amend. IV. Similarly, the Pennsylvania Constitution sets forth that the "people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affined." Pa. Const. Art. I, § 8.

Generally, a warrantless search or seizure of persons, places, or possessions is unconstitutional under both the federal and Pennsylvania Constitution, unless both probable cause and exigent circumstances exist. *Commonwealth v. Wright,* 599 Pa. 270, 961 A.2d 119, 137 (2008). Additionally, Pennsylvania courts have interpreted our constitution in the search and seizure arena to encompass broader protections than the federal constitution, giving more weight to the privacy interests of the people. *Commonwealth v. Edmunds,* 526 Pa. 374, 586 A.2d 887, 897–899 (1991). As the *Edmunds* Court forcefully stated, "our

---

**3.** *See* 18 Pa.C.S. § 5743(c)(2) (effective December 8, 2008 to December 23; 2012).

Constitution has historically been interpreted to incorporate a strong right of privacy, and an equally strong adherence to the requirement of probable cause under Article 1, Section 8." *Id.* at 899 (emphasis added). The critical inquiry in this case is whether the government must have probable cause to locate a person through real time cell site location information from the person's cellular phone, or whether a court order based on specific and articulable facts is sufficient.

The cell phone has become a ubiquitous part of the American citizen's life. These phones regularly relay their location to cellular towers that serve the cell network, and a cellular service provider can accurately determine the location of the cell phone within approximately 200 feet if the cell phone is on. *See In re United States for an Order Directing Provider of Electronic Communication Service To Disclose Records to the Government,* 534 F.Supp.2d 585, 590 (W.D.Pa.2008) ("*Electronic Communications, I* "), *reversed by* 620 F.3d 304 (3d Cir.2010). Cell phone tracking is accomplished by using data that shows the time it takes for a signal to move between a tower and phone as well as the angle at which the tower receives the signal from the phone. *Id.* at 590 n. 19. Through a process known as triangulation, a person's cell phone may be tracked in real time to an even more precise area. *Id.* at 590. Triangulation involves deciphering the signal strength of the three cellular towers that are closest to the phone. The more cellular towers in an area, the more accurate the results. Further, over ninety percent of cell phones now have built-in GPS location tracking abilities. *Id.* Thus, law enforcement officials are able to determine, with increasing accuracy, the location of a person via the individual's cell phone. Tracking a person without any visual contact or physically attaching some type of tracking device to the individual is no longer mere science fiction, but modern reality. *Cf. United States v. Jones,* —— U.S. ——, 132 S.Ct. 945, 955, 181 L.Ed.2d 911 (2012) (Sotomayor, J. concurring) ("With increasing regularity, the Government will be capable of duplicating the monitoring undertaken in this case by enlisting factory-or owner-installed vehicle tracking devices or GPS-enabled smartphones.").

Appellant first contends that he had a reasonable expectation of privacy in the intercepted cell phone signals. He avers that cell phone users "reasonably expect that the government will not be tracking their location through cell phone signal[s], particularly where they are located inside a residence." Appellant's brief at 24. Appellant also argues that pursuant to Pennsylvania constitutional law, he had a privacy interest in "telephonically created electronic impulses used to track or trace calls." *Id.* According to Appellant, the utilization of real time data is analogous to using pen registers.[4] He then cites *Com-*

---

**4.** A pen register is statutorily defined as follows.

"**Pen register.**" A device which is used to capture, record or decode electronic or other impulses which identify the numbers dialed or otherwise transmitted, with respect to wire or electronic communications, on the targeted telephone. The term includes a device which is used to record or decode electronic or other impulses which identify the existence of incoming and outgoing wire or electronic communications on the targeted telephone. The term does not include a device used by a provider or customer of a wire or electronic communication service for billing, or recording as an incident to billing, for communication service provided by the provider, or any device used by a provider, or customer of a wire communication service for cost accounting or other like purposes in the ordinary course of business.

monwealth v. Melilli, 521 Pa. 405, 555 A.2d 1254 (1989), wherein our Supreme Court held that police may not use a pen register without obtaining an order based on probable cause. Since the court order in the present case did not rely on probable cause, Appellant argues that the pinging was an unconstitutional search.

In addition, Appellant posits that the search violated the then applicable version of the Pennsylvania Wiretap Act. Appellant asserts that the Pennsylvania Wiretap Act defines a telecommunication identification interception device in a manner that renders his cell phone substantially indistinguishable from such a device. Specifically, a telecommunication identification interception device is defined as:

Any equipment or device capable of intercepting any electronic communication which contains any electronic serial number, mobile identification number, personal identification number or other identification number assigned by a telecommunication service provider for activation or operation of a telecommunication device.

18 Pa.C.S. § 5702. Since such a device cannot be used without a court finding probable cause, see 18 Pa.C.S. § 5773(a),[5] he submits that the search was improper.

The Commonwealth responds by asserting that Appellant did not have a privacy interest in his cell phone signal and cites an unreported federal court decision, Unit-ed States v. Ortega–Estrada, 2008 WL 4716949 (N.D.Ga.2008), for support. Ortega–Estrada relied on United States v. Knotts, 460 U.S. 276, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983), wherein law enforcement officials placed a beeper inside a container to track the suspects. The Supreme Court held that the beeper only enhanced visual surveillance and did not reveal movement in a private area. As the same information was available via visual observation, it held that no constitutional violation occurred. Compare United States v. Karo, 468 U.S. 705, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984) (finding a Fourth Amendment violation where police placed a tracking beeper inside a chemical drum, without probable cause, which was subsequently used to determine its presence in a residence). The Commonwealth also advances the argument that because Appellant was armed and accused of three murders, that he did not have a "legitimate expectation of privacy in his cell phone signal[.]" Commonwealth's brief at 20. Furthermore, the Commonwealth contends that pinging is not governed by the Wiretap Act since it does not involve the interception of aural transfers or electronic communications. In the alternative, the Commonwealth argues that the Pennsylvania Wiretap Act permits the court to issue an order allowing real time tracking where specific and articulable facts are presented to the court.

18 Pa.C.S. § 5702.

5. The then applicable version of the statute provided:
§ 5773. Issuance of an order for use of certain devices
(a) In general.—Upon an application made under section 5772 (relating to application for an order for use of certain devices), the court shall enter an ex parte order authorizing the installation and use of a pen register, a trap and trace device or a telecommu-nication identification interception device within the jurisdiction of the court if the court finds that there is probable cause to believe that information relevant to an ongoing criminal investigation will be obtained by such installation and use on the targeted telephone.
18 Pa.C.S. § 5773(a). The statute has been amended to encompass cell phone tracking, defined as mobile communications tracking information.

In sum, Appellant contends that because this was a warrantless search, police were required to demonstrate probable cause before obtaining the court order herein. *See* Appellant's brief at 21.[6] In contrast, the Commonwealth argues that Appellant had no reasonable expectation of privacy in his cell phone signal and that warrantless tracking of a person by their cell phone is constitutionally permissible. Alternatively, the Commonwealth posits that Appellant forfeited his expectation of privacy once he was accused of three murders. Finally, the Commonwealth presents two divergent views of the applicability of the Pennsylvania Wiretap Act. First, it asserts that the Pennsylvania Wiretap Act does not apply and, in the alternative, that if the act does apply, it authorizes a court to issue an order permitting real time tracking based on specific and articulable facts.

We address the applicability of the Pennsylvania Wiretap Act first. Resolution of whether the Pennsylvania Wiretap Act applies implicates application of a legislative provision. We note that, "In reviewing the trial court's interpretation of statutory language, we are mindful of the well-settled rule that statutory interpretation implicates a question of law. Thus, our scope of review is plenary, and our standard of review is *de novo.*" *Commonwealth v. Dixon,* 53 A.3d 839, 842 (Pa.Super.2012) (citations and quotation marks omitted).

The Pennsylvania statute read in relevant part:

**(c) Records concerning electronic communication service or remote computing service.—**

. . . .

(2) A provider of electronic communication service or remote computing service **shall disclose a record or other information pertaining to a subscriber to or customer of the service,** not including the contents of communications covered by subsection (a) or (b), to an investigative or law enforcement officer only when the investigative or law enforcement officer:

(i) uses an administrative subpoena authorized by a statute or a grand jury subpoena;

**(ii) obtains a warrant issued under the Pennsylvania Rules of Criminal Procedure;**

**(iii) obtains a court order for the disclosure under subsection (d); or**

(iv) has the consent of the subscriber or customer to the disclosure.

(3) An investigative or law enforcement officer receiving records or information under paragraph (2) is not required to provide notice to the customer or subscriber.

**(d) Requirements for court order.—A** court order for disclosure under subsection (b) or (c) **shall be issued only if the investigative or law enforcement officer shows that there are specific and articulable facts showing that there are reasonable grounds to believe that** the contents of a wire or electronic communication, or **the records or other information sought, are relevant and material to an ongoing criminal investigation.** A court issuing an order pursuant to this section, on a motion made promptly by the service provider, may quash or modify the order if the infor-

6. Appellant sought suppression of the handgun and other items of personal property that belonged to the victims, such as two game systems. He also makes a one-sentence argument that his confession was the result of an illegal arrest and also should be suppressed. Since Appellant has utterly failed to demonstrate how police did not have probable cause to effectuate his arrest, this position fails.

mation or records requested are unusually voluminous in nature or compliance with the order would otherwise cause an undue burden on the provider.

18 Pa.C.S. § 5743(c)(2)-(d) (emphases added) (effective December 8, 2008 to December 23, 2012).

■■■ As has been noted by the federal courts, the scope of the analogous federal stored communications provision is limited to past data, *i.e.,* stored communications. *In re Application of United States for Orders Authorizing Installation and Use of Pen Registers and Caller Identification Devices,* 416 F.Supp.2d 390 (D.Md.2006); *In re Application for Pen Register and Trap/Trace Device With Cell Site Location Authority,* 396 F.Supp.2d 747, 760 (S.D.Tex.2005). Similarly, prospective data was not covered by the applicable language of Pennsylvania's Wiretap Act. Phrased differently, Pennsylvania's stored communications statute did not contemplate information that did not already exist at the time law enforcement was seeking the court order. Also, as one federal judge reasoned, "since a subscriber does not use the phone to track his own movements in real time[,] prospective cell site

data appears to be unrelated to any customer (as opposed to law enforcement) use of the provider's services." *In re Application for Pen Register and Trap/Trace Device With Cell Site Location Authority,* 396 F.Supp.2d at 759. Indeed, another federal jurist has opined:

> As a technical matter, [cell site location information ("CSLI")] does not provide information about a particular person or entity (and a subscriber or customer is necessarily a person or entity), Rather, it constitutes "a record or other information" about *the cell phone-*specifically, about the location of the cell phone at a specific moment in time. It does not and cannot disclose whether the person whose movements are being tracked by the CSLI is the cell phone provider's "subscriber" or "customer."

*In re Application of U.S. for an Order Authorizing Use of a Pen Register with Caller Identification Device Cell Site Location Authority on a Cellular Telephone,* 2009 WL 159187, *5 (S.D.N.Y.2009) (italics in original). Thus, the prior version of Pennsylvania's Wiretap Act did not govern real time cell phone tracking.[7]

---

7. Governmental access to historical, as compared to real time, cell site information at the time of the order in this case was governed in Pennsylvania by the Wiretapping and Electronic Surveillance Control Act's ("Pennsylvania Wiretap Act") subchapter C, which is entitled, Stored Wire and Electronic Communications and Transactional Records Access. The federal court in *In re U.S. for Orders Authorizing Installation and Use of Pen Registers and Caller Identification Devices on Telephone Numbers,* 416 F.Supp.2d 390, 392 n. 4 (D.Md.2006), defined real time and historical cell site information as follows.

> "Real time" cell site information refers to data used by the government to identify, with varying degrees of accuracy, the location of a phone at the present moment. Real time cell site information is a subset of "prospective" cell site information, which refers to all cell site information that is

generated after the government has received court permission to acquire it. Records stored by the wireless service provider that detail the location of a cell phone in the past (i.e. prior to entry of the court order authorizing government acquisition) are known as "historical" cell site information.

The General Assembly passed legislation that became effective December 24, 2012, which specifically defines mobile communications tracking information, *i.e.,* cell phone tracking, and requires probable cause for a court order to issue. *See* 18 Pa.C.S. § 5773 (requiring probable cause for court order of cell phone tracking); 18 Pa.C.S. § 5702 (defining mobile communication tracking information). The amendment also permits a court to verbally authorize the disclosure of mobile communication tracking information if exigent circumstances are present. *Id.* Mo-

Further, even if the prior version of the Pennsylvania Wiretap Act did apply, the Commonwealth's reliance on a recent Third Circuit decision, *In re United States for an Order Directing Provider of Electronic Communication Service To Disclose Records to the Government*, 620 F.3d 304 (3d Cir.2010) (*"Electronic Communications, II "*), to advance its argument that specific and articulable facts are sufficient to justify real time cell phone tracking is misplaced. The Third Circuit decision involved an interpretation of the Stored Communications Act, 18 U.S.C. § 2703, a provision within the federal Electronic Communications Privacy Act, the federal version of Pennsylvania's Wiretap Act.[8] Therein, federal prosecutors applied for an

order to compel a cell phone provider to produce historical cell site location information. The federal district court, following the majority of district court decisions, determined that probable cause was necessary for an order to obtain either real-time or historical cell site information, although the real time data discussion was *dicta*. *See Electronic Communications, I, supra, reversed by* 620 F.3d 304 (3d Cir.2010).[9]

The Third Circuit in *Electronic Communications, II*, relying on *Knotts, supra* and *Karo, supra* stated that where there was no evidence in the record that *historical* cell site location information extended to the interior of a home, probable cause is unnecessary.[10] In a concurring opinion,

bile communications tracking information is defined in as "Information generated by a communication common carrier or a communication service which indicates the location of an electronic device supported by the communication common carrier or communications service." 18 Pa.C.S. § 5702.

8. The federal law stated in pertinent part:
 **(c) Records concerning electronic communication service or remote computing service.—(1)** A governmental entity may require a provider of electronic communication service or remote computing service to disclose a record or other information pertaining to a subscriber to or customer of such service (not including the contents of communications) only when the governmental entity—
 **(A)** obtains a warrant issued using the procedures described in the Federal Rules of Criminal Procedure (or, in the case of a State court, issued using State warrant procedures) by a court of competent jurisdiction;
 **(B)** obtains a court order for such disclosure under subsection
 (d) of this section;
 . . . .
 **(d) Requirements for court order.—**A court order for disclosure under subsection (b) or (c) may be issued by any court that is a court of competent jurisdiction and shall issue only if the governmental entity offers specific and articulable facts showing that there are reasonable grounds to believe that the contents

of a wire or electronic communication, or the records or other information sought, are relevant and material to an ongoing criminal investigation. In the case of a State governmental authority, such a court order shall not issue if prohibited by the law of such State. A court issuing an order pursuant to this section, on a motion made promptly by the service provider, may quash or modify such order, if the information or records requested are unusually voluminous in nature or compliance with such order otherwise would cause an undue burden on such provider. 18 U.S.C. § 2703.

9. According to the federal magisterial judge, the United States Attorney's Office for the Western District of Pennsylvania does "not pursue prospective cell tower information without a probable cause affidavit[.]" *In re United States for an Order Directing Provider of Electronic Communication Service To Disclose Records to the Government* 534, F.Supp.2d 585, 586 n. 4 (W.D.Pa.2008), *reversed by* 620 F.3d 304 (3d Cir.2010).

10. The lower federal courts are split on the issue of whether an order based on probable cause is necessary for real time cell site information; however, the majority of cases have required probable cause for real time data. *See e.g. In re Application of U.S. for an Order Authorizing Disclosure of Location Information of a Specified Wireless Telephone,* 2011 WL 3423370, *49 (D.Md.2011); *In re Applica-*

tion of U.S. for an order relating to Target Phone 2, 733 F.Supp.2d 939 (N.D.Ill.2009); In re Application of the United States for an Order Authorizing the Use of a Pen Register With Caller Identification Device Cell Site Location Authority on a Cellular Telephone, 2009 WL 159187 (S.D.N.Y.2009); In re Application of U.S. for Order, 497 F.Supp.2d 301 (D.P.R. 2007); In re Application of the United States for an Order Authorizing (1) Installation and Use of a Pen Register and Trap and Trace Device or Process, (2) Access to Customer Records, and (3) Cell Phone Tracking, 441 F.Supp.2d 816 (S.D.Tex.2006); In re Application for an Order Authorizing the Installation and Use of a Pen Register and Directing the Disclosure of Telecommunications Records, 439 F.Supp.2d 456 (D.Md.2006); In re Application of United States for Orders Authorizing Installation and Use of Pen Registers and Caller Identification Devices, 416 F.Supp.2d 390 (D.Md.2006); In re United States Application for an Order Authorizing Installation and Use of a Pen Register, 415 F.Supp.2d 211 (W.D.N.Y.2006); In re Application of the United States for an Order Authorizing the Disclosure of Prospective Cell Site Information, 412 F.Supp.2d 947 (E.D.Wis.2006); In re Application of the U.S. for an Order Authorizing the Release of Prospective Cell Site Information, 407 F.Supp.2d 134 (D.D.C.2006); Application of the United States for an Order Authorizing the Installation and Use of a Pen Register and a Caller Identification System on Telephone Numbers (Sealed) and Production of Real Time Cell Site Information, 402 F.Supp.2d 597 (D.Md.2005); In re Application of the United States for an Order (1) Authorizing the Use of a Pen Register and a Trap and Trace Device and (2) Authorizing Release of Subscriber Information and/or Cell Site Information, 396 F.Supp.2d 294 (E.D.N.Y.2005); In re Application for Pen Register and Trap/Trace Device With Cell Site Location Authority, 396 F.Supp.2d 747 (S.D.Tex.2005); In re Application of the United States for an Order Authorizing Pen Register and Trap and Trace Device and Release of Subscriber Information and/or Cell Site Information, 384 F.Supp.2d 562 (E.D.N.Y.2005); In re Application of the United States for an Order Authorizing the Disclosure of Prospective Cell Cite Information, 2006 WL 2871743 (E.D.Wis.2006); In re Application of the United States for an Order (1) Authorizing the Installation and Use of a Pen Register and Trap and Trace Device; (2) Authorizing the Release of Subscriber and Other Information; and (3) Authorizing the Disclosure

of Location–Based Services & In re Application of the United States for an Order (1) Authorizing the Installation and Use of a Pen Register and Trap and Trace Device; (2) Authorizing the Release of Subscriber and Other Information; and (3) Location of Cell Site Origination and/or Termination, 2006 WL 1876847 (N.D.Ind.2006); In re Application of the United States for an Order for Prospective Cell Site Location Information on a Certain Cellular Telephone, 2006 WL 468300 (S.D.N.Y.2006); In re Application of the United States for Orders Authorizing the Disclosure of Cell Cite Information, 2005 WL 3658531 (D.D.C.2005).

These decisions reason as follows. Under federal statutory law, a cell phone falls within the definition of a tracking device. Tracking devices do not come within the purview of an electronic communication. The specific and articulable facts standard applies to records or information pertaining to electronic communications. Since the cell site information is not an electronic communication, probable cause is necessary. This rationale, however, is inapplicable to the Pennsylvania statute because cell phones are not within the parameters of the statutory definition of a tracking device. A "tracking device" under the Pennsylvania Wiretap Act is defined as, "[a]n electronic or mechanical device which permits **only** the tracking of the movement of a person or object." 18 Pa.C.S. § 5702 (emphasis added).

Cases allowing prospective cell site information based on specific and articulable facts are the following. In re Application of the United States for an Order Authorizing the Use of Two Pen Register and Trap and Trace Devices, 2008 WL 5082506 (E.D.N.Y.2008); In re Application of the United States for an Order: (1) Authorizing the Installation and Use of a Pen Register and Trap and Trace Device, and (2) Authorizing Release of Subscriber and Other Information, 622 F.Supp.2d 411 (S.D.Tex. 2007); In re Applications of U.S. for Orders Pursuant to Title 18, U.S.Code Section 2703(d), 509 F.Supp.2d 76 (D.Mass.2007); In re Application of the United States for an Order for Prospective Cell Site Location Information on a Certain Cellular Telephone, 460 F.Supp.2d 448 (S.D.N.Y.2006); In re Application of the United States for an Order (1) Authorizing the Installation and Use of a Pen Register and Trap and Trace Device, and (2) Authorizing Release of Subscriber and Other Information, 433 F.Supp.2d 804 (S.D.Tex.2006); In re Application of the United States for an Order

Judge Tashima added that a federal magisterial judge could refuse to issue an order based on specific and articulable facts if it permitted "police access to information which reveals a cell phone user's location within the interior or curtilage of his home." *Electronic Communications, II, supra* at 320 (Tashima, J. concurring).

Appellant does not challenge the government's request for historical cell site information. Therefore, that issue is not before this Court and the rationale of *Electronic Communications, II,* does not apply. Finally, the minority of federal decisions that have determined that probable cause is unnecessary for real time cell site location data all have based their conclusions on what has been labeled as a hybrid theory, which is inapplicable in Pennsylvania. The hybrid theory uses the federal Pen Register, Trap and Trace Devices Act and Stored Communications Act in tandem to uphold the searches on a lesser standard than probable cause. *See* footnote 10, *supra* (collecting cases). These courts and the federal government have conceded that the federal Stored Communications Act standing alone is insufficient to justify a search of real time cell site information based on specific and articulable facts. *Id.* Under then applicable Pennsylvania law, the Pen Register, Trap and Trace Devices statute required probable cause. 18 Pa. C.S. § 5773 (effective December 8, 2008 to December 23, 2012); *see also Melilli, su-*

*pra.* Thus, it cannot be used together with Pennsylvania's stored communications provision in the same manner as in the federal cases. Moreover, the record in this case does establish that the real time data was used to narrow Appellant's location to an actual residence in Wilkes–Barre, Pennsylvania, with the question being which exact residence.

### Part II(b)

 Next, we conclude that under the Pennsylvania Constitution, Appellant did have a legitimate expectation of privacy that the government could not surreptitiously track his real time location via his cell phone signal.[11] This is especially so because tracking via a cell phone signal will invariably locate people inside private dwellings where their expectation of privacy is at its highest. We recognize that police herein only narrowed Appellant's cell phone location to within 300 feet; nevertheless, the lack of precision also means that the government cannot accurately ascertain whether it is invading a residence. Under the federal constitution's lesser search and seizure protections, probable cause ordinarily is required whenever location tracking information stretches to private property. *See Karo, supra.* Our Supreme Court in the seminal *Edmunds* decision explained in scholarly fashion Pennsylvania's heightened standards in the search and seizure field.[12]

*Authorizing the Installation and Use of a Pen Register with Caller Identification Device and Cell Site Location Authority on a Certain Cellular Telephone,* 415 F.Supp.2d 663 (S.D.W.Va.2006); *In re Application of the United States for an Order (1) Authorizing the Installation and Use of a Pen Register and Trap and Trace Device; and (2) Authorizing Release of Subscriber Information and/or Cell Site Information,* 411 F.Supp.2d 678 (W.D.La. 2006); *In re Application of the United States for an Order for Disclosure of Telecommunications Records and Authorizing the Use of a Pen*

*Register and Trap and Trace,* 405 F.Supp.2d 435 (S.D.N.Y.2005).

The reasoning of these cases is inapplicable in Pennsylvania as outlined in the body of this decision.

11. This, of course, does not apply to the situation where a cell phone is stolen because a thief has no reasonable expectation of privacy in stolen property.

12. The Commonwealth has not advanced any argument relative to the Pennsylvania Constitution.

The requirement of probable cause in this Commonwealth thus traces its origin to its original Constitution of 1776, drafted by the first convention of delegates chaired by Benjamin Franklin. The primary purpose of the warrant requirement was to abolish "general warrants," which had been used by the British to conduct sweeping searches of residences and businesses, based upon generalized suspicions. Therefore, at the time the Pennsylvania Constitution was drafted in 1776, the issue of searches and seizures unsupported by probable cause was of utmost concern to the constitutional draftsmen.

Moreover, as this Court has stated repeatedly in interpreting Article 1, Section 8, that provision is meant to embody a strong notion of privacy, carefully safeguarded in this Commonwealth for the past two centuries. As we stated in [*Commonwealth v.*] *Sell* [504 Pa. 46, 470 A.2d 457 (Pa.1983) ]: "the survival of the language now employed in Article 1, Section 8 through over 200 years of profound change in other areas demonstrates that the paramount concern for privacy first adopted as part of our organic law in 1776 continues to enjoy the mandate of the people of this Commonwealth." *Id.* 504 Pa. at 65, 470 A.2d at 467.

*Edmunds, supra* at 897 (some citations omitted). The *Edmunds* Court continued, stating, "a steady line of case-law has evolved under the Pennsylvania Constitution, making clear that Article I, Section 8 is unshakably linked to a right of privacy in this Commonwealth." *Id.* at 898 (citations omitted). In *Commonwealth v. DeJohn*, 486 Pa. 32, 403 A.2d 1283, 1289 (1979), our Supreme Court held, "The protection provided by Article I, s[ection] 8, of the Pennsylvania Constitution extend [sic] to those zones where one has a reasonable expectation of privacy."

■ The Pennsylvania Supreme Court has stated that the concurring opinion of Justice Harlan in *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576, (1967), "sets forth the foundation for both federal and Pennsylvania · constitutional law analysis with respect to constitutionally-protected privacy expectations." *Commonwealth v. Rekasie*, 566 Pa. 85, 778 A.2d 624, 628 (2001). Therefore, the test is whether Appellant exhibited an actual subjective expectation of privacy and that the expectation is one that society is prepared to recognize as reasonable. *Id.* citing *Katz, supra* at 361–62, 88 S.Ct. 507 (Harlan, J., concurring). The *Rekasie* Court, nonetheless, did recognize that Pennsylvania law does not track federal constitutional jurisprudence when it comes to this test. Notably, the Court in *Rekasie* highlighted that information that is voluntarily disclosed does not automatically render it unprotected. *Id.* at 630 ("under Pennsylvania Constitutional jurisprudence, it is manifest that a citizen's expectation of privacy can extend, in some circumstances, to information voluntarily disclosed to others."). Information that is not voluntarily turned over to another party is even more sacrosanct.

Real time data pertaining to a cell phone's location is not voluntarily conveyed. *See Electronic Communications, II, supra* at 317. Instead, so long as the phone is on, data is automatically transmitted independent of the user. Some cell phone users may be unaware that the government can track their present whereabouts simply by using cell site location information. While a cell phone service provider has the ability to access this information, that does not translate into a waiver of an expectation of privacy. *Cf. DeJohn, supra* (constitutional protections of Article I, Section 8 extend to bank records). If this were so, individuals

would forfeit constitutional protections to other important information whenever a third party has the ability to access the information.

Additionally, we reject the Commonwealth's position that because a person is a criminal suspect, he no longer possesses a reasonable expectation of privacy; this far-reaching contention would entirely eviscerate the constitutional search and seizure protections. *See also Electronic Communications, II, supra* at 318 ("The Government is also not free from the warrant requirement merely because it is investigating criminal activity."); *Commonwealth v. Cockfield,* 431 Pa. 639, 246 A.2d 381, 384 (1968) ("a search without a warrant is not reasonable simply because the officers have probable cause to believe that incriminating evidence will be disclosed. If this constituted 'exigent circumstances,' it would be almost impossible to think of a case in which a warrant would be necessary.") (internal citations omitted). A similar position was rejected by the United States Supreme Court in discussing the lesser protections of the Fourth Amendment. In *Karo, supra* at 716, 104 S.Ct. 3296 the High Court explained:

> We cannot accept the Government's contention that it should be completely free from the constraints of the Fourth Amendment to determine by means of an electronic device, without a warrant and without probable cause or reason-

able suspicion, whether a particular article-or a person, for that matter-is in an individual's home at a particular time. Indiscriminate monitoring of property that has been withdrawn from public view would present far too serious a threat to privacy interests in the home to escape entirely some sort of Fourth Amendment oversight.

■ Admittedly, in this case, there was judicial oversight; nevertheless, insofar as the Commonwealth advances the position that no reasonable expectation of privacy exists in one's own cell phone signals in Pennsylvania, we reject that argument. Additionally, since cell phone tracking can invariably invade the right to privacy in one's home, as cell phones are generally carried by the user wherever they travel, we believe that society is prepared to recognize that it is reasonable to expect that the government cannot trace one's location via his or her cell phone absent probable cause. Thus, we hold that under the Pennsylvania Constitution police were required to make a showing of probable cause in order to obtain real time cell site information data of Appellant's cell phone.[13]

■ Insofar as the concurring opinion suggests that a probable cause analysis is unnecessary, we reiterate that a warrantless search or seizure is generally only constitutionally permissible where *both* probable cause and exigent circumstances

---

**13.** We are cognizant that our rules of criminal procedure relevant to search warrants do not contemplate the present situation. *See* Pa.R.Crim.P. 201 (stating that a search warrant may be issued for contraband, fruits of a crime, other things criminally possessed, property used for committing a crime, or property that is evidence of a criminal offense). Real time cell site information does not fall into any of these categories. Nor does it easily fit within the parameters of an anticipatory search warrant, which involves a warrant for a specified place that will contain

evidence of a crime at a future time. *See Commonwealth v. Glass,* 562 Pa. 187, 754 A.2d 655 (2000). Here, the search would be of a cell service provider's data in order to find a person via locating his or her cell phone's location. This information is more analogous to the contents for a probable cause order for pen registers and trap and trace devices, which, as of December 24, 2012, applies to cell phone tracking. *See* 18 Pa.C.S. § 5773. Thus, the statutory modifications to the Wiretap Act are consistent with our disposition.

exist. *Wright, supra* (warrantless seizure of blood at hospital); *Commonwealth v. Hernandez*, 594 Pa. 319, 935 A.2d 1275 (2007) (warrantless search of rental truck); *Commonwealth v. Lee*, 972 A.2d 1 (Pa.Super.2009) (warrantless search of private property); *Commonwealth v. Fickes*, 969 A.2d 1251 (Pa.Super.2009) (warrantless search of garage); *Commonwealth v. Dean*, 940 A.2d 514 (Pa.Super.2008) (warrantless search of hotel room); *Commonwealth v. McAliley*, 919 A.2d 272 (Pa.Super.2007) (warrantless search of residence). Exigent circumstances alone is not conclusive as to whether a search or seizure is constitutionally permissible. *Wright, supra* at 137 ("a dual inquiry, both parts requiring affirmative answers must be made: first, whether there existed probable cause to search; and secondly, whether exigent circumstances can be found to excuse the obtaining of a warrant.").

Both this Court and our Supreme Court have repeatedly held that probable cause and exigent circumstances are needed to justify a warrantless search of homes and automobiles as well as seizures of automobiles and that probable cause is needed to conduct electronic surveillance. In the instant case, Appellant's argument is precisely that because no warrant was issued, a probable cause determination is necessary to conduct real time tracking of an individual via his cell phone signal. The Commonwealth counters that probable cause was unnecessary and that it only needed to provide "specific and articulable facts" as articulated in the Wiretap Act to support its usage of real time cell phone tracking. The issue of whether probable cause is required, therefore, is essential in determining whether a warrantless search or seizure in this evolving area is constitutionally sound, just as it was when the law on automobile searches and seizures was emerging.[14]

**14.** To proceed only to an exigent circumstances analysis ignores a vital aspect of search and seizure constitutional analysis. Moreover, the concurring opinions cited no authority for dispensing with the need for probable cause to perform a search or seizure based on real time or even historical cell site information. Judge Strassburger's opinion cites to a case which specifically requires an analysis of whether both probable cause and exigent circumstances are present and then concludes that we need not reach the issue. *See* Strassburger J. concurring, at 972 (citing to *Commonwealth v. Wright*, 599 Pa. 270, 961 A.2d 119, 137 (2008)).

. Further, it erroneously declares that there is no dispute as to whether probable cause was demonstrated. Appellant certainly disputed whether probable cause was shown and in his brief stated the application for the search "was based solely on a hunch and without specific and articulable facts[.]" Appellant's brief at 24. In addition, despite declaring that we should not engage in a probable cause analysis, the concurrence by Judge Strassburger performs that very analysis in cursory fashion by merely citing to the trial court opinion, which did examine probable cause. Hence, Judge Strassburger engages in the very discussion he opines is unnecessary.

President Judge Stevens also misconstrues our findings regarding the Wiretap Act. The current Wiretap Act does not apply because it was not passed until after this case concluded; however, the legislature in passing the current Wiretap Act adopted a probable cause standard, which, I believe, is consistent with Pennsylvania constitutional principles. The prior Wiretap Act, though in effect, was inapplicable because it did not address real-time cell-phone tracking. Whether the prior Wiretap Act governed or not is separate from the constitutional question of whether a warrantless search is constitutionally valid. President Judge Stevens' position is a *non-sequitur;* it simply does not follow that a determination that the previous or current Wiretap Act did or did not apply relieves this Court of its duty to address whether the search was constitutionally valid. To be sure, even if the prior Wiretap Act did apply, one could have challenged whether the previous Wiretap Act was a violation of the Pennsylvania Constitution if it permitted searches absent probable cause.

*Part II(c)*

■ Having concluded that probable cause is necessary, we next determine whether probable cause existed and address whether exigent circumstances were present. The Commonwealth maintains that exigent circumstances excused any warrant requirement. A warrant is unnecessary if both probable cause and exigent circumstances are present. *Commonwealth v. Gibson,* 536 Pa. 123, 638 A.2d 203 (1994) (holding that exigent circumstances alone was insufficient to justify warrantless search of an apartment); *Commonwealth v. Rowe,* 984 A.2d 524 (Pa.Super.2009). A determination as to whether probable cause exists is based on the totality of circumstances. *Commonwealth v. Thompson,* 604 Pa. 198, 203, 985 A.2d 928 (Pa.2009). "Probable cause exists where the facts and circumstances within the officers' knowledge are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed." *Gibson, supra* at 206. Here, probable cause undoubtedly existed. Police knew that Appellant had not only physically restrained three people against their will, but brutally attacked and killed three others.

■ In deciding whether exigent circumstances exist, a court ordinarily looks to: (1) the gravity of the offense; (2) if there is a reasonable belief that the suspect is armed; (3) whether there is a clear showing of probable cause; (4) whether there is a strong showing that the suspect is within the premises to be searched; (5) the likelihood a suspect will escape; (6) whether entry is peaceable; (7) the time of entry; (8) the likelihood that evidence may be destroyed and; (9) the danger to police or persons inside or outside the place entered. *Commonwealth v. Walker,* 836 A.2d 978, 981 (Pa.Super.2003).[15] The Commonwealth reasons that because Appellant was suspected of a triple murder, possessed a gun, eyewitnesses described aspects of the crimes, was a danger to others, threatened to continue his crime spree, and fled, it established exigent circumstances. The suppression court held that exigent circumstances existed. Appellant counters that police "had sufficient time to obtain information concerning [Appellant's] cell phone provider, interview witnesses and, then, prepare an order and petition seeking real time cell data." Appellant's brief at 27. Therefore, he argues that the Commonwealth had enough time to prepare an affidavit of probable cause.

■ Whether the Commonwealth had time to obtain a search warrant, though a factor, is not dispositive to our appellate review of the trial court's finding of exigent circumstances in this case. Since Appellant had just committed a triple homicide, was armed and dangerous, and most importantly, had indicated that he intended to continue his crime spree, we agree that exigent circumstances existed herein. The seriousness of Appellant's crimes cannot be understated, he was armed, police had probable cause to arrest him, and he was a danger to others. These factors in combination support a

Accordingly, contrary to President Judge Stevens' characterization, our appellate review does necessitate a warrantless search discussion. To the extent that President Judge Stevens' opinion can be read to infer that an issue raised on appeal concerning governmental searches or seizures involving real time cell site information date does not require probable cause, the new Wiretap Act plainly provides otherwise for cases arising under that provision.

15. This test is perhaps inapt to the situation where the government is seeking access to prospective cell site information, which is not itself a search of a premises, but intended to locate a person via his or her cell phone, including within a residence.

finding that exigent circumstances existed. As both probable cause and exigent circumstances were present, the Commonwealth acted within its constitutional bounds in obtaining the real time cell site information after receiving a court order from the trial court.

### Part II(d)

■ Even absent probable cause and exigent circumstances, we hold that overwhelming admissible evidence was introduced in this case that would render the admission of any evidence illegally seized from the house in which Appellant was located harmless error.[16] Our Supreme Court has explained

the doctrine of harmless error is a technique of appellate review designed to advance judicial economy by obviating the necessity for a retrial where the appellate court is convinced that a trial error was harmless beyond a reasonable doubt. Its purpose is premised on the well-settled proposition that "a defendant is entitled to a fair trial but not a perfect one."

*Commonwealth v. Allshouse*, 604 Pa. 61, 985 A.2d 847, 859 (2009) (quoting *Commonwealth v. Thornton*, 494 Pa. 260, 431 A.2d 248, 251 (1981)). In ascertaining whether harmless error exists, appellate courts look to whether the error prejudiced the defendant or the prejudice was *de minimis;* if the erroneously-admitted evidence was merely cumulative of other untainted evidence that is substantially similar to the erroneously-admitted evidence; or the properly-admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed

to the verdict. *Commonwealth v. Hutchinson*, 571 Pa. 45, 811 A.2d 556, 561 (2002).

■ The evidence introduced in this case includes Appellant's own confession, Appellant's admission to Samantha that he killed Justin, eyewitness testimony from the three surviving witnesses, including Cynthia Collier's description of hearing her own son being bludgeoned to death, as well as extensive physical evidence. Further, witnesses testified that Appellant attempted to sell items that had been stolen from the Collier/Hintz residence. In light of the considerable evidence arrayed against Appellant, which we outlined in our discussion of the facts, any error in not suppressing the gun and other evidence found at the home where Appellant was arrested was harmless.

### Part III

■ Appellant's third and fourth issues on appeal pertain to the sufficiency of the evidence and whether he could lawfully be convicted of kidnapping and second-degree murder where the underlying felony was kidnapping.

The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [this] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and incon-

---

**16.** The stolen vehicle and evidence found therein would not have been suppressible as

Appellant does not have an expectation of privacy in the stolen car.

clusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Lopez*, 2012 PA Super. 161, 57 A.3d 74, 79 (quoting *Commonwealth v. Chine*, 40 A.3d 1239, 1242 (Pa.Super.2012)).

The crux of Appellant's position is that an individual cannot kidnap another by restraining that person in his or her own residence where discovery is likely. The kidnapping statute at the time of Appellant's trial provided in pertinent part:

(a) **Offense defined.**—Except as provided in subsection (a.1), a person is guilty of kidnapping if he unlawfully removes another a substantial distance under the circumstances from the place where he is found, or **if he unlawfully confines another for a substantial period in a place of isolation**, with any of the following intentions:

(1) To hold for ransom or reward, or as a shield or hostage.

(2) To facilitate commission of any felony or flight thereafter.

(3) To inflict bodily injury on or to terrorize the victim or another.

(4) To interfere with the performance by public officials of any governmental or political function.

18 Pa.C.S. § 2901(a) (emphasis added).

Appellant reasons that the kidnapping victims were not moved a substantial distance and the language "place of isolation" does not apply herein. Appellant relies on *Commonwealth v. Hughes*, 264 Pa.Super. 118, 399 A.2d 694 (1979), *Commonwealth v. Hook*, 355 Pa.Super. 10, 512 A.2d 718 (1986), and *Commonwealth v. Jenkins*, 455 Pa.Super. 152, 687 A.2d 836 (1996), in support of his argument. The defendant in *Hughes* placed a knife to the female victim's throat and forced her to walk to his car one and one-half blocks away. He then drove around the area for two miles and forced the victim into a wooded area and raped her. Hughes alleged that he did not remove the victim a substantial distance or confine her for a substantial period.

The *Hughes* Court surveyed then-existing precedent in defining the term "substantial" and found that a kidnapping did occur. It noted that kidnapping in other jurisdictions was broadly defined, and opined that the definition of the crime was taken to its extreme in a case where a defendant was convicted of kidnapping when he forced a woman from room to room in her own home and robbed and raped her. The *Hughes* Court remarked that the Model Penal Code definition of kidnapping, which Pennsylvania tracks, was drafted more restrictively. The Court continued, "it is clear to us that the legislature intended to exclude from kidnapping the incidental movement of a victim during the commission of a crime which does not substantially increase the risk of harm to the victim." *Id.* at 698. *Hughes*, however, was not focused on the term "place of isolation." The Superior Court addressed that issue in *Hook, supra.*

In *Hook*, a jury convicted the defendant of two counts of kidnapping after he entered one woman's apartment and chased her into the apartment of an elderly female neighbor. He found both women in a

closet and attempted to disrobe the younger woman, choked her, and struck the elderly woman. The defendant subsequently passed out. The panel in *Hook* held that the defendant did not kidnap the women. The *Hook* Court recognized that a victim need not be moved if "held in a place of isolation for a substantial period." *Id.* at 719. It continued, "a man might be seized in his own summer home in the mountains and held there for ransom." *Id.* Additionally, the panel opined that, "[c]onceivably one's own apartment in a city might in rare cases be regarded as a 'place of isolation,' if detention is made under circumstances which make discovery or rescue unlikely." However, it acknowledged:

> The direction of the criminal law has been to limit the scope of the kidnapping statute, with its very substantially more severe penal consequences, to true kidnapping situations and not to apply it to crimes which are essentially robbery, rape or assault and in which some confinement or asportation occurs as a subsidiary incident.

*Id.* at 720. Thus, the **Hook** panel reasoned that no kidnapping occurred where the victim's apartment was frequented by relatives and business contacts, an open business was located directly underneath the apartments, and an employee from a local dry cleaning store was expected to arrive shortly. The court specifically held that discovery or rescue was not unlikely and the confinement was incidental to his attempted rape.

This Court distinguished *Hook* in *Jenkins, supra.* Therein, the defendant forced his way into a seventy-year-old woman's residence. Also at the home were the woman's four-year-old great-grandson, her eighteen-month-old great-granddaughter, and the children's mother. The defendant grabbed a six-inch knife

from the kitchen and picked up the four-year-old boy who had followed him into the kitchen. He held the knife to the back of the child and said, "today is the day to die." *Jenkins, supra* at 837. The defendant ordered the children's mother to leave and buy him cigarettes. The woman gathered her daughter and exited, summoning the police. For five hours, the defendant held the great-grandmother and the four-year-old child hostage, holding the young boy at knife point.

In upholding the kidnapping convictions, the *Jenkins* Court held that "a 'place of isolation' is 'not geographic isolation, but rather effective isolation from the usual protections of society.'" *Id.* at 838. The panel concluded that the victims were isolated from rescue because there was no access to the house or victims for over four hours while the defendant negotiated with police. Importantly, it further decided that the victim's detention "was the core crime and not incidental to some other crime." *Id.* at 839.

More recently, this Court closely analyzed the kidnapping statute in *In re T.G.*, 836 A.2d 1003 (Pa.Super.2003). The court in *T.G.* upheld an adjudication of delinquency for kidnapping based on the following facts. The fourteen-year-old female delinquent seized a six-year-old girl and dragged the young child into her house. The victim had been playing outside with a friend in front of the delinquent's neighbor's home. The young victim initially ran away but returned when the delinquent enticed her with candy. When the little girl's friend, a young boy, attempted to follow the victim into the house, the delinquent shut the door and refused him entry. The delinquent proceeded to pull the victim's hair and "told her she was going to 'kick her mommy's ass,' and would not let the victim leave." *Id.* at 1005. After about twenty minutes, the delinquent exit-

ed her home with the victim. She continued to pull the victim's hair, strike her, and held her by the shirt collar while holding a metal bat and taunting the victim's mother to come and retrieve her daughter. The *T.G.* Court first held that the young victim was moved a substantial distance, which is not at issue here. It then proceeded to analyze whether the victim was confined in a place of isolation for a substantial period. We found that the delinquent's actions were not incidental to a different crime and resulted in the young girl being taken from public view for a period of time that, for a small child, was substantial.

In this case, with regards to Cynthia, Appellant maintains that she was placed in her son's bedroom immediately across the hall from her own bedroom, her legs were not bound, nor was the door closed. He adds that both he and Cynthia expected her husband to return, and he expressly stated that they could call for help once he arrived, or, if Appellant was not home at 6:30 a.m., she could do whatever she wanted. According to Appellant, Cynthia's confinement "was incidental to the commission of other crimes." Appellant's brief at 32.

As to Matthew, Appellant submits that he never removed Matthew from his own room or bed. Additionally, he points to Matthew's testimony that Appellant told him that they "were free to do whatever we like" if he did not return in a half-hour. N.T., 9/27/10, at 264. Since Matthew was not moved and his father was expected home soon, Appellant asserts that Matthew was not kidnapped. Regarding Samantha, Appellant argues that she was held in her own room and that her confine-

ment was incidental to his intended crime of sexually assaulting her.

The Commonwealth counters that Cynthia, Matthew, and Samantha "were sufficiently isolated from the usual protections of society, by the defendant, such as to satisfy the requisite element of Kidnapping." Commonwealth's brief at 28. It highlights that Cynthia was handcuffed behind her back and held at gunpoint after she attempted to call 911. Further, the Commonwealth notes that she was forced to stay in Matthew's bedroom for one to two hours and listen to Appellant bludgeon to death her son, Dustin. In addition, the Commonwealth contends that Appellant held Matthew in a place of isolation by binding his hands and legs and keeping him in his own room. Similarly, the Commonwealth reasons that Samantha was kidnapped because her hands and feet were bound and she "was forced to remain on her bed under threat of rape, and was shown the dead body of Justin Berrios, the father of her child." Commonwealth's brief at 31. The trial court held that Appellant's actions of threatening the victims with a gun and tying them up throughout the morning prevented them from availing "themselves of the normal protections of society, and rescue and discovery were unlikely because they could not leave or call to get help without endangering their own lives and the lives of others." Trial Court Opinion, 2/1/11, at 17.

 Though the facts of this case are especially disturbing and the victims no doubt were placed in incredible fear, we conclude that, even viewing the evidence in a light most favorable to the Commonwealth, the prosecution did not establish that the victims were in a place of isolation in their own home.[17] We begin by noting

---

17. Certainly, these egregious actions establish unlawful restraint and false imprisonment. *See* 18 Pa.C.S. § 2902; 18 Pa.C.S. § 2903. Appellant, however, was not charged with these crimes.

that, "we are required to strictly construe criminal statutes. 1 Pa.C.S. § 1928(b)(1); *Commonwealth v. McClintic,* 589 Pa. 465, 909 A.2d 1241 (2006)" and "[a]ny doubt as to a criminal statute's meaning is to be resolved in favor of the defendant. *Commonwealth v. Graham,* 607 Pa. 580, 9 A.3d 196, 202 n. 13 (2010)." *Commonwealth v. Greene,* 25 A.3d 359, 361 (Pa.Super.2011), *appeal granted,* 616 Pa. 590, 52 A.3d 222 (2012).

■■■ Pennsylvania's kidnapping statute has been held to have intended to remove from its ambit "the incidental movement of a victim during the commission of a crime which does not substantially increase the risk of harm to the victim." *Hughes, supra* at 698. In construing the "place of isolation" language, this Court has opined that the statute does not apply to situations where the confinement is a subsidiary incident to another crime. *See Hook, supra; Jenkins, supra.* Phrased differently, kidnapping, pursuant to the place of isolation aspect of the statute, does not occur in one's own residence where it is incidental to other crimes being committed by the perpetrator. Further, we have held that the confinement must be "under circumstances which make discovery or rescue unlikely." *Hook, supra* at 719. Indeed, it is the rare case that one's own abode can be considered a place of isolation. *Id.*

■■■ In the case *sub judice,* the Commonwealth and trial court focused on Appellant's binding of the victims and repeated terrorizing of them with verbal threats and a firearm. While these facts are disturbing and heinous in nature, they were subsidiary to the core crimes that Appellant was committing. Appellant's objective was to murder, rob, and sexually assault. Appellant did not secrete the victims in an attic, closet, or basement so that discovery would be made more difficult,

nor is this a case where he prevented police from gaining access to the victims once they arrived on the scene as in *Jenkins.* The likelihood of discovery was recognized by both the victims and Appellant due to the awareness that Wes Collier would soon be arriving home. Here, the facts lead to the conclusion that the victims' confinement was incidental to Appellant's more ghastly acts. Therefore, we are constrained to reverse Appellant's convictions for kidnapping and second-degree murder.

### Part IV

■■■ The final issue Appellant sets forth in this appeal is that the trial court erred in admitting bad acts evidence. "The trial court's decision to allow the admission of evidence is a matter within its sound discretion, and we will reverse that decision only when it has been shown that the trial court abused that discretion." *Commonwealth v. Briggs,* 608 Pa. 430, 12 A.3d 291, 336 (2011).

Specifically, Appellant avers that the court erred in allowing the Commonwealth to introduce evidence that he was jealous of Samantha's relationship with three male co-workers and wanted to fight each of them. Samantha testified, over objection, that Appellant told her these individuals only spoke to her to obtain a sexual relationship with her. She also related that while she was speaking on the phone with DePatrick Bogle, one of her co-workers, Appellant grabbed the phone and began to argue with Mr. Bogle the day before the killings. Another co-worker, Herberto Pena, testified that Appellant asked him where Mr. Bogle lived. Mr. Bogle stated that Appellant asked him if he was "messing" with Samantha and would "let Samantha cry over [his] dead body." N.T., 9/29/10, at 166. Appellant contends that Pena and Bogle were unconnected to the

murder victims and any jealousy he had toward them "shed no light on the motivation for harming Dustin Hintz and Leslie Collier." Appellant's brief at 39. Furthermore, Appellant posits that because he never harmed Samantha's co-workers, the evidence only portrayed him as a violent person.

The Commonwealth responds that the evidence was admissible to establish Appellant's motive. The Commonwealth avers that Appellant was jealous of males who had contact with Samantha and the evidence was relevant to show motive for the killing of Justin Berrios. In support of its position, the Commonwealth references *Commonwealth v. Glover*, 446 Pa. 492, 286 A.2d 349 (1972). In *Glover*, the defendant stabbed to death a man who was present at his estranged girlfriend's apartment. The former girlfriend testified that two to three weeks before the attack, the defendant forced his way into her apartment and punched another man in the face and threatened to kill him. That man also was present when the defendant stabbed the victim. Our Supreme Court held her testimony admissible.

Bad acts evidence is governed by Pa. R.E. 404(b), which read in salient part:

**(b) Other crimes, wrongs, or acts.**

(1) Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.

(2) Evidence of other crimes, wrongs, or acts may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.

(3) Evidence of other crimes, wrongs, or acts proffered under subsection (b)(2) of this rule may be admitted in a criminal case only upon a showing that the pro-

bative value of the evidence outweighs its potential for prejudice.

Pa.R.E. 404(b)(1)-(3). Rule 404(b)(1) is merely a codification of the well-settled evidentiary law that "evidence of prior crimes and bad acts is generally inadmissible if offered for the sole purpose of demonstrating the defendant's bad character or criminal propensity[.]" *Commonwealth v. Powell*, 598 Pa. 224, 956 A.2d 406, 419 (2008). In contrast, Rule 404(b)(2) permits the use of such evidence in certain instances, including proof of motive.

In the instant case, Appellant's motive for the crimes was, in his own words, to give Samantha something to remember. Appellant was jealous of her relationships with other men, including Justin Berrios and her co-workers. The evidence showing Appellant's jealousy of men whom he perceived as close to Samantha is directly pertinent to his motive for the drastic actions he took the morning of July 17, 2008, *i.e.*, getting even with Samantha. Moreover, this evidence did not purport to show Appellant committed any prior crimes; thus, the prejudicial nature of the evidence does not outweigh its probative value. Hence, we hold that Appellant's last issue does not warrant relief.

In sum, we reverse Appellant's convictions for kidnapping and second degree murder, but affirm all other convictions. As Appellant was not sentenced on the felony murder convictions, we only vacate the judgment of sentence as it pertains to kidnapping. Since this will not disturb Appellant's three life sentences, we find it unnecessary to remand for resentencing.

Judgment of sentence of thirty to sixty years imprisonment imposed on the kidnapping convictions is vacated and the second-degree murder convictions are reversed. In all other respects, the judgment of sentence is affirmed. Jurisdiction relinquished.

President Judge STEVENS files a Concurring Opinion and Judge STRASSBURGER files a Concurring Opinion.

## CONCURRING OPINION BY STEVENS, P.J.

While I agree with the Majority's ultimate decision not to disturb Appellant's three life sentences, to vacate the sentence imposed on the kidnapping convictions and to reverse the second-degree murder convictions, the discussion of whether probable cause is necessary before the government may utilize real time cell phone tracking is not warranted, and I would not have reached it, nor do I agree with it.

Importantly, the Majority declared that a determination of whether the Commonwealth had had time to obtain a search warrant was "not dispositive" of this Court's appellate review of the trial court's finding of exigent circumstances. In addition, the Majority determined that the current Wiretap Act is inapplicable to the instant matter and that police were able to narrow Appellant's whereabouts by using real time rather than stored data after securing a court order based on specific and articulable facts.

Clearly, the Majority found our appellate review did not necessitate a search warrant discussion and that the Commonwealth had exigent circumstances and set forth specific, articulable facts to conduct the search under the totality of the circumstances. As such, it was unnecessary for the Majority to proceed one step further in its analysis and declare probable cause is necessary in order for the government to utilize real time cell phone tracking.

Thus, I deem an issue raised on appeal concerning whether or not police properly obtained real time cell site information data of an appellant's cell phone is properly decided on a case-by-case basis, under the totality of the circumstances presented therein. I would agree with the Majority that in the matter *sub judice,* Appellant's heinous crimes and future threat to others support a finding that exigent circumstances existed.

## CONCURRING OPINION BY STRASSBURGER, J.

I join parts I(a), I(b), I(c), II(c), II(d), III, and IV of the majority opinion.

As to parts II(a) and II(b), I respectfully concur in the result. I respectfully disagree with the Majority's position that the "critical inquiry in this case is whether the government must have probable cause to locate a person through real time cell site location information from the person's cellular phone, or whether a court order based on specific and articulable facts is sufficient." Majority Opinion, at 955. Instead, the proper inquiry for this case, like any other case where there is a warrantless search, is whether such warrantless search was constitutionally sound. Our courts conduct a two part inquiry to determine whether a warrantless search is valid: we determine "first, whether there existed probable cause to search; and secondly, whether exigent circumstances can be found to excuse the obtaining of a warrant." *Commonwealth v. Wright,* 599 Pa. 270, 961 A.2d 119, 137 (2008). Where both parts are answered affirmatively, the warrantless search is valid.

In this case, both probable cause and exigent circumstances existed and therefore the warrantless search was sound. As the trial court noted, "[i]t is difficult to imagine a case where more exigent circumstances could have existed than this one. Thus even if the warrant requirement applied here, it was excused by the strong need for immediate action and apprehension of [Appellant]." Trial Court Opinion, 1/26/2010, at 27. Furthermore,

"there was probable cause to believe that [Appellant] committed these murders, including that three eyewitnesses who were also in the house when the murders took place and before he had fled identified him as the killer." *Id.*

Thus, I respectfully disagree with the Majority's decision to reach the issue of whether a probable cause determination is necessary prior to obtaining real time cell phone tracking data in this case where there was a valid warrantless search.