J-A12011-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| DARNELL BALLARD, | : | |
| | : | |
| Appellant | : | No. 3519 EDA 2012 |

Appeal from the Judgment of Sentence Entered July 3, 2012,
In the Court of Common Pleas of Bucks County,
Criminal Division, at No. CP-09-CR-00001344-2012.

BEFORE: SHOGAN, STABILE and PLATT*, JJ.

MEMORANDUM BY SHOGAN, J.:          **FILED SEPTEMBER 11, 2014**

Appellant, Darnell Ballard, appeals from the judgment of sentence

entered in the Court of Common Pleas of Bucks County on July 3, 2012,

following a jury trial. We affirm.

The trial court summarized the factual history of this case as follows:

> In December of 2010, the Thirty-Second Statewide
> Investigating Grand Jury began hearing evidence concerning a
> large scale heroin distribution ring operating in six counties
> within the Commonwealth—Philadelphia, Chester, Delaware,
> Montgomery, Perry and Bucks. The Grand Jury issued three
> Presentments: Presentment No. 2, issued March 23, 2011,
> Presentment No. 8, issued June 21, 2011 and Presentment No.
> 18, issued October 13, 2011. Those Presentments collectively
> recommended the Attorney General arrest and prosecute 31
> individuals, including [Appellant], identified as belonging to the
> "Black Widow" heroin distribution ring, for violations of the
> Controlled Substance, Drug, Device and Cosmetic Act, 35 P.S. §
> 780-113(a), the Corrupt Organizations statute and other
> offenses under the Crimes Code as a result of the widespread

_____
*Retired Senior Judge assigned to the Superior Court.

dissemination of heroin stamped "Black Widow" in southeast Pennsylvania. Appellant, his uncle Victor Ballard, and his brother, Anthony Gary, purchased "Black Widow" heroin from members of the organization located in Philadelphia which they, along with another family member, Brian Ballard, then sold in Bucks County.

Three electronically intercepted telephone calls established [Appellant's] participation in the "Black Widow" heroin distribution organization. The calls occurred between [Appellant] and Fausto Gabriel Valdez-Cordero, identified as the number two member in the "Black Widow" hierarchy. On these calls, [Appellant] facilitated Victor Ballard's purchase of "Black Widow" heroin from Fausto Gabriel Valdez-Cordero.

On February 4, 2011, [Appellant] used Victor Ballard's cellular telephone[5] to call Fausto Gabriel Valdez-Cordero to coordinate a pre-arranged meeting between Victor Ballard and another member of the "Black Widow" heroin organization for the purchase of forty bundles[6] of heroin by Victor Ballard[, as follows:]

> [5] That same cell phone was used numerous times to arrange for the purchase of "Black Widow" heroin from Valdez-Cordero.
>
> [6] Agent Timothy Riley testified that one "bundle" of heroin contains fourteen packets of heroin.

FAUSTO GABRIEL VALDEZ-CORDERO: What time he be there?

[APPELLANT]: Pop,[7] he said he'd be there in ten minutes, he's ready.

> [7] "Pop" is a name of recognition used by Victor Ballard, Anthony Gary, and other drug dealers when referring to or speaking with Fausto Valdez-Cordero.

FAUSTO GABRIEL VALDEZ-CORDERO: He's sure ten minutes because my guy's gotta go somewhere, but you gonna be there in ten minutes I'm gonna tell him to meet you first, OK, so let me know.

[APPELLANT]: He said ten minutes, he already there, that's why he told me to call.

FAUSTO GABRIEL VALDEZ-CORDERO: Huh?

[APPELLANT]: I said he'll be there in ten minutes.

FAUSTO GABRIEL VALDEZ-CORDERO: Ok.

Thirty minutes later, [Appellant] again called Fausto Gabriel Valdez-Cordero. The following exchange occurred at that time:

FAUSTO GABRIEL VALDEZ-CORDERO: Yo man, what up?

[APPELLANT]: He there, Poppy.

FAUSTO GABRIEL VALDEZ-CORDERO: You there?

[APPELLANT]: Yeah, he there now.

FAUSTO GABRIEL VALDEZ-CORDERO: Ok, let me call him, call my guy . . . .

[APPELLANT]: Alright, he ain't got the other phone, he ain't got this phone.

FAUSTO GABRIEL VALDEZ-CORDERO: Oh, alright.

[APPELLANT]: He got the other phone he called you on.

FAUSTO GABRIEL VALDEZ-CORDERO: Alright.

The next day, February 5, 2011, Fausto Gabriel Valdez-Cordero called Victor Ballard's cell phone. [Appellant] answered:

[APPELLANT]:  Hello.

FAUSTO GABRIEL VALDEZ-CORDERO:  Yo Pop.

[APPELLANT]:  He didn't get back Pop.

FAUSTO GABRIEL VALDEZ-CORDERO:  What?

[APPELLANT]:  He still went to the store, he didn't get back from the store yet, you gotta call his other phone.

FAUSTO GABRIEL VALDEZ-CORDERO:  You gotta call . . . . He didn't answer.

[APPELLANT]:  Ohhh, hold on . . .

FAUSTO GABRIEL VALDEZ-CORDERO:  Ohhh, he callin me right now.

[APPELLANT]:  Alright.

In order to prove that the voice on the intercepted calls was that of [Appellant], the Commonwealth introduced the voice exemplar of [Appellant].  Prison recordings of [Appellant's] telephone calls while incarcerated at Bucks County Correctional Facility were also introduced.  Finally, Agent Timothy Riley testified that he recognized the voice on the three intercepted telephone calls to be that of [Appellant].

Trial Court Opinion, 3/28/13, at 1–4 (internal citations and one footnote omitted).

On June 7, 2012, the jury found Appellant guilty of conspiracy to deliver heroin and three counts of criminal use of a communication facility. The court sentenced him on July 3, 2012, to a term of incarceration of five to fifteen years.  Appellant filed timely post-sentence motions; following

hearings on September 19, 2012, and October 5, 2012,[1] the trial court denied the motions on December 7, 2012. Appellant filed a notice of appeal on December 21, 2012. Both Appellant and the trial court complied with Pa.R.A.P. 1925.

Appellant presents the following issues for our review:

A. Did the Commonwealth violate its due process obligations under *Brady v. Maryland* and its progeny and Pa.R.Crim.P. 573 by failing to disclose that state investigators were not following basic investigative protocols by failing to document a majority of investigative interviews and contacts with co-defendants including Fausto Gabriel Valdez-Cordero, Fausto Ezequiel Valdez-Cordero, Erika Rosa and Jose Sanchez despite [Appellant's] pre-trial notice of intent of raising a defense attacking the reliability, thoroughness and good faith of the state's investigation?

B. Did the Commonwealth violate its due process obligations under *Brady v. Maryland* and its progeny and Pa.R.Crim.P. 573 by failing to disclose the existence of the March 6, 2012, undocumented exculpatory investigative interview of co-defendant Fausto Gabriel Valdez-Cordero conducted by state investigators in the presence of the Commonwealth's Attorney where co-defendant Fausto Gabriel Valdez-Cordero failed to identify the Appellant after exposure to incriminating intercepted phone calls of the Appellant and after failing to otherwise incriminate the Appellant?

Appellant's Brief at 8. We address the issues together.

Appellant asserts that the Commonwealth violated *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny and Pa.R.Crim.P. 573 by failing to disclose that state investigators were not following "basic

---

[1] We note that the transcript from the October 5, 2012 hearing is erroneously labeled Friday, October 6, 2012. All citations to the transcript will be noted herein as 10/[5]/12.

investigative protocols." Appellant's Brief at 22. Appellant alleges that the Commonwealth failed to document a majority of investigative interviews and contacts with Fausto Ezequiel Valdez-Cordero, Fausto Gabriel Valdez-Cordero, Erika Rosa, and Jose Sanchez despite Appellant's pretrial notice of intent to raise a defense attacking the reliability, thoroughness, and good faith of the investigation. Appellant maintains that he would have presented an alternate defense if the *Brady* evidence had been disclosed to him prior to trial by attacking the competence, credibility, good faith, and bias of the Commonwealth's main witness against Appellant. Appellant avers that he would have assailed the original physical identification of Appellant, as well, if the *Brady* violation had not occurred. Appellant's Brief at 34.

A *Brady* claim challenges the Commonwealth's failure to produce material evidence. Under *Brady*:

> "a prosecutor has an obligation to disclose all exculpatory information material to the guilt or punishment of an accused, including evidence of an impeachment nature." *Commonwealth v. Spotz*, 18 A.3d 244, 275–76 (Pa. 2011) (citation omitted). To establish a *Brady* violation, appellant must demonstrate: the evidence at issue was favorable to him, because it was either exculpatory or could have been used for impeachment; the prosecution either willfully or inadvertently suppressed the evidence; and prejudice ensued. *Id.* at 276 (citation omitted). "The evidence at issue must have been 'material evidence that deprived the defendant of a fair trial.' . . . 'Favorable evidence is material . . . if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Id.* (citations omitted).

*Commonwealth v. Walker*, 36 A.3d 1, 9 (Pa. 2011). Thus, a prosecutor's "suppression of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, regardless of the good or bad faith of the prosecution." *Commonwealth v. Small*, 741 A.2d 666, 676 (Pa. 1999).

> The burden of proof is on the defendant to demonstrate that the Commonwealth withheld or suppressed evidence. The United States Supreme Court has held, "The prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial." *United States v. Bagley*, 473 U.S. 667, 675, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (footnote omitted). Similarly, this Court has limited the prosecution's disclosure duty such that it does not provide a general right of discovery to defendants. Moreover, we have held that the prosecution is not obligated to reveal evidence relating to fruitless leads followed by investigators.
>
> "To satisfy the prejudice inquiry, the evidence suppressed must have been material to guilt or punishment." As noted . . ., materiality extends to evidence affecting the credibility of witnesses, rather than merely to purely exculpatory evidence. Moreover, we have held that the protection of *Brady* extends to the defendant's ability to investigate alternate defense theories and to formulate trial strategy. *See Commonwealth v. Green*, 536 Pa. 599, 640 A.2d 1242, 1245 (1994) (holding that courts must "consider any adverse effect that the prosecutor's failure to disclose might have had on not only the presentation of the defense at trial, but the preparation of the defense as well.").

*Commonwealth v. Cam Ly*, 980 A.2d 61, 75–76 (Pa. 2009) (some internal citations omitted).

In making his argument, Appellant also relies upon Pa.R.Crim.P. 573(B)(1)(a), which provides, in relevant part, as follows:

**Rule 573. Pretrial Discovery and Inspection**

\* \* \*

**(B) Disclosure by the Commonwealth.**

> (1) *Mandatory*.  In all court cases, on request by the defendant, and subject to any protective order which the Commonwealth might obtain under this rule, the Commonwealth shall disclose to the defendant's attorney all of the following requested items or information, provided they are material to the instant case.  The Commonwealth shall, when applicable, permit the defendant's attorney to inspect and copy or photograph such items.
>
> > (a)  Any evidence favorable to the accused that is material either to guilt or to punishment, and is within the possession or control of the attorney for the Commonwealth;

Clearly, the key requirement of Pa.R.Crim.P. 573, whether under Rule 573(B)(1) mandatory or (b)(2) discretionary disclosure, is that the items requested be material.  **See Commonwealth v. Johnson**, 815 A.2d 563, 573 (Pa. 2002) (stating evidence withheld must be material).  "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the results of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  **Commonwealth v. Jones**, 637 A.2d 1001, 1004 (Pa. Super. 1997).  As our Supreme Court has stated:

> [T]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but

whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A reasonable probability of a different result is shown when the government's suppression of evidence undermines confidence in the outcome of the trial. The United States Supreme Court has made clear that ***Bagley's*** materiality standard is not a sufficiency of the evidence test. A ***Brady*** violation is established by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. Importantly, the mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish materiality in the constitutional sense.

***Commonwealth v. Hutchinson***, 25 A.3d 277, 310 (Pa. 2011) (internal citations and quotation marks omitted).

The Commonwealth explains that the present case was a year-long investigation involving numerous witness contacts as well as thirty co-defendants. The investigation generated twelve DVDs and CDs containing thousands of pages of documents including: interviews of approximately nineteen co-defendants; laboratory results; Bristol Township Police reports; Pennsylvania State Police reports; search warrants and affidavits; surveillance reports; handwritten surveillance notes; wiretap orders, applications, attachments, and final orders; cellular telephone tower locations; criminal histories of Appellant and his co-defendants; Pen/Ping[2]

---

[2] A "Ping" determines "the real time location of [a] cell phone by looking at the cell signal between the phone and the closest cell tower and finding the last known address where the cell phone transmitted a signal requesting service." ***Commonwealth v. Rushing***, 71 A.3d 939, 946 (Pa. Super.

orders, applications and affidavits; prison recordings; voice exemplars; videos; tens of thousands of hours of audio intercepts; monitor logs; transcripts; grand jury presentments and transcripts; impeachment evidence regarding defense witnesses called at trial; and, a list of potential Commonwealth witnesses. N.T., 10/[5]/12, at 102–106, 127–135.

As the Commonwealth points out, Appellant could have discovered the lack of certain documentation "with even the slightest diligence." Commonwealth Brief at 23. As we stated in **Commonwealth v. Rhodes**, 54 A.3d 908 (Pa. Super. 2012), "There is no **Brady** violation when the appellant knew or, with reasonable diligence, could have uncovered the evidence in question, or when the evidence was available to the defense from non-governmental sources. **Id**. at 914 (quoting **Commonwealth v. Chamberlain**, 30 A.3d 381, 409 (Pa. 2011) (quotations, quotation marks, and citations omitted)).

For example, defense counsel stipulated that he received: (1) a BNI supplement for an interview conducted with Erika Rosa on February 15, 2011; (2) a report of an interview with Fausto Gabriel Valdez-Cordero conducted on July 21, 2011; (3) a report of an interview with Fausto Ezequiel Valdez-Cordero conducted on January 25, 2012; and (4) a report of an interview with Jose Sanchez dated August 10, 2011. N. T., 10/[5]/12, at

_____

2013), _petition for allowance of appeal granted in part on other grounds_, 84 A.3d 699 (Pa. 2014).

10–11. In post-sentence motions, Appellant asserted that subsequent interviews of these four individuals were conducted, that he was not provided with that information during discovery, and therefore, the Commonwealth violated its obligation under ***Brady***. The trial court, however, determined that there was "no evidence that any of the contacts the agents had with the aforementioned codefendants resulted in the disclosure of any relevant or exculpatory information," and therefore, "no basis to conclude that any discovery violations occurred." Trial Court Opinion, 3/28/13, at 10. Moreover, our review of the record reveals that the investigative agents, including Agent Riley, were subpoenaed for trial as early as March 2012. N.T., 10/[5]/12, at 119; N.T., 3/12/12, at 43. Agent Riley testified that he would have spoken to defense counsel prior to trial and would have answered counsel's questions. N.T., 10/[5]/12, at 119–120. Defense counsel, however, did not attempt to speak to Agent Riley or any other agent. *Id*. at 120.

> The trial court addressed the issue as follows:
>
> As to Erika Rosa, Agent Riley testified that he conducted approximately three interviews with Rosa after her arrest. She was not asked to listen to the intercepted telephone conversations relevant to [Appellant's] case. Rosa was not interviewed about [Appellant]. Rosa never provided the investigators with any evidence which would have exculpated [Appellant].
>
> As to Fausto Ezequiel Valdez-Cordero, the evidence established that agents only met with him for a few minutes in

March of 2012. Fausto Ezequiel Valdez-Cordero refused to answer questions posed by law enforcement. No report was written.

As to Jose Sanchez, although the evidence clearly established that he was a member of the Corrupt Organization, the evidence also established that he did not have any dealings with the Bristol Township members of the organization which included [Appellant]. Nonetheless, his initial interview with agents was provided to the defense in discovery. In 2012, agents met with Jose Sanchez for a second time. During that interview, Sanchez reaffirmed the information he had already provided during his initial interview which had been reduced to writing and provided to defense counsel in discovery.

As to Fausto Gabriel Valdez-Cordero, as already stated, although he spoke with investigators prior to [Appellant's] trial, he did not provide information which was relevant to [Appellant's] participation in the organization.

[Appellant] argues that the Commonwealth violated its discovery obligations by "failing to document the majority of investigative interviews/contacts with Co-Defendants, despite [Appellant's] pre-trial notice of intent of raising a defense attacking the reliability, thoroughness and good faith of the state investigation." The Commonwealth conceded that it did not memorialize in a written report each time one of its agents spoke to or had contact with each of the 30 co-defendants and/or potential witnesses throughout the course of this on-going investigation. However, none of those undocumented follow-up contacts with co-defendants involved [Appellant]. Many of the follow-up interviews of the various co-defendants not only did not involve [Appellant] but many times did not involve the "Black Widow" operation. Many of the co-defendants were being interviewed regarding other investigations. Since there is no evidence that the government suppressed, intentionally or unintentionally, any evidence favorable to the accused, there can be no discovery violation.

Trial Court Opinion, 3/28/13, at 11–12 (internal citations omitted). Our review of the record confirms the trial court's determination.

Although the investigation was very well documented, the investigators were not required to take detailed notes of all investigative activity, nor record every word said by each co-defendant wholly unrelated to Appellant during the investigation. *See*, *e.g.*, *Small*, 741 A.2d at 676 (stating there is "no constitutional requirement that a prosecutor make a complete and detailed accounting to the defense of all police investigatory work on a particular matter"); *see also Commonwealth v. Appel*, 689 A.2d 891, 907 (Pa. 1997) ("The prosecution is not required under *Brady* to 'make a complete and detailed accounting to the defense of all police investigatory work on a case.'").

Assuming, *arguendo*, that Appellant could establish investigators were required to generate police reports for every detail of the investigation, and that Appellant could not have discovered the lack of reports with reasonable diligence, we also conclude he has not demonstrated that the information was material or exculpatory. Agent Riley testified at the September 19, 2012 post-sentence hearing that he had met with Erika Rosa on a few occasions for which he had not generated a report. N.T., 9/19/12 at 17–20, 28–29. Appellant acknowledged that the Commonwealth had provided a report of a February 15, 2011 interview with Ms. Rosa. N.T., 10/[5]/12, at 10. The Commonwealth presented evidence that Ms. Rosa's interviews were documented in Supplemental Reports 9 and 14 which were provided to the

defense. Commonwealth Post-Sentence Hearing Exhibit C-1. None of Ms. Rosa's statements, about which Agent Riley was questioned, pertained to Appellant. N.T., 9/19/12, at 29–33. Agent Riley testified that he questioned Ms. Rosa about unrelated investigations in Philadelphia as well as other individuals who had not been charged. *Id*. at 69. Appellant's role in the "Black Widow" investigation was limited to Bristol Township and the Bucks County area, not Philadelphia. Indeed, Agent Riley specifically stated that none of the discussions with Ms. Rosa involved Appellant. *Id*. at 69–70. He further testified that Ms. Rosa did not provide **any** information, exculpatory or inculpatory, about Appellant. *Id*. at 70. Further, Erika Rosa was not called as a witness against Appellant at trial. Moreover, Agent Freddie Chavez testified at the October 5, 2012 hearing, which was a continuation of the September 19, 2012 post-sentence hearing, that Erika Rosa never made any reference to Appellant. N.T., 10/[5]/12, at 75.

Agent Riley testified that he had met with Fausto Ezequiel Valdez-Cordero on March 6, 2012, but Valdez-Cordero was not cooperative and "was not forthcoming at all" with any information; thus nothing was written down. N.T., 9/19/12 at 37–40. Appellant acknowledged receipt of a report regarding a January 25, 2012 interview with Valdez-Cordero. N.T., 10/[5]/12, at 10; Supplemental Report 53; Defense Post-Sentence Hearing Exhibit U. Valdez-Cordero provided no exculpatory or inculpatory

information regarding Appellant, and the Commonwealth did not call him as a witness against Appellant at trial.

The Commonwealth also provided defense counsel with a letter pertaining to Fausto Ezequiel Valdez-Cordero dated January 26, 2012, which stated:

> [I]nterviews were conducted with Jose Sanchez and Fausto Ezequiel Valdez-Cordero. Jose Sanchez could not identify your client's voice on the three telephone calls at issue. Fausto Ezequiel Valdez-Cordero does not know your client. Your client's voice was not played for Valdez-Cordero.

N.T., 10/[5]/12, at 86-87, 131; Commonwealth Post-Sentence Hearing Exhibit 7; Defense Post-Sentence Motion Exhibit Q. Agent Chavez testified that he had contact with Fausto Ezequiel Valdez-Cordero regarding the "Black Widow" investigation and met with him on a number of occasions regarding other drug dealers and other organizations unrelated to the "Black Widow" investigation. N.T., 10/[5]/12 at 56–57.

Agent Riley testified that he met with Jose Sanchez on more than one occasion and testified that the first interview was documented in a police report but the remainder were not. N.T., 9/19/12, at 42. Appellant acknowledged that he received a report of an August 10, 2011 interview with Sanchez. N.T., 10/[5]/12, at 11. The January 26, 2012 letter referenced above also included information pertaining to Sanchez. *Id*. at 131. Jose Sanchez's interview was also contained in Supplemental Report

45, which was provided in discovery. Commonwealth Post-Sentence Hearing Exhibit 4. Agent Riley testified that a May 25, 2012 interview concerned Sanchez's potential testimony against co-defendant Franklin Vargas. N.T., 9/19/12, at 43. While Sanchez's statements during preparation for testimony were consistent with his first documented interview, he subsequently testified inconsistently on the witness stand. *Id*. at 45–46. Mr. Sanchez, however, provided no exculpatory or inculpatory information against Appellant. *Id*. at 46. Agent Riley testified that the investigation revealed that Mr. Sanchez did not have any connection to the Bristol Township suspects, including Appellant. *Id*. at 82–83. Mr. Sanchez was not called as a witness against Appellant at trial.

Agent Riley also testified that he spoke with a number of other individuals, some of whom were involved in the "Black Widow" investigation. N.T., 9/19/12, at 72. Agent Riley specifically testified that none of the undocumented interviews had anything to do with Appellant. *Id*. at 72–73. He further stated that those individuals did not even know Appellant. *Id*. at 74–75.

Appellant has failed to meet his burden of showing that the undocumented interviews had impeachment value. As noted above, Fausto Ezequiel Valdez-Cordero, Fausto Gabriel Valdez-Cordero, Erika Rosa, and Jose Sanchez did not know Appellant and had no information about him. As

the Commonwealth suggests, "[T]he inability of Jose Sanchez and Fausto Gabriel Valdez-Cordero, the only two co-defendants to be played the three questioned intercepted conversations, to identify Appellant's voice was entirely predictable given they did not know him." Commonwealth Brief at 31.

Finally, Appellant has not established prejudice. He argues that he was prejudiced because he would have presented an alternate strategy at trial challenging "the reliability, competency and good faith of the overall investigation." Appellant's Brief at 32. We question the veracity of this statement in light of the fact that Appellant knew prior to trial that information pertaining to him, including the alibi investigation and the discovery of his voice on recordings, was not documented. In particular, at the January 17, 2012 hearing on Appellant's motion for discovery, the Commonwealth conceded that it had investigated the alibi and was withdrawing the charge related to the January 31, 2011 drug delivery. N.T., 1/17/12, at 25. The Commonwealth specifically advised Appellant and the trial court that there were no written reports pertaining to the investigation into the alibi. *Id*. at 27–28, 35. Defense counsel acknowledged this representation by the Commonwealth. *Id*. at 33. Despite this knowledge, Appellant failed to use the information to undermine the credibility of the

investigation itself or the credibility of the investigators, as he now claims he would have done.

In his second issue, Appellant alleges that the Commonwealth failed to disclose the March 6, 2012 undocumented interview of co-defendant Fausto Gabriel Valdez-Cordero by state investigators, Agents Riley and Chavez, where Valdez-Cordero failed to identify Appellant in the presence of the Commonwealth's Attorney. He contends he would have challenged the prosecutor's credibility, good faith, and bias "by exposing his role in suppressing the undocumented March 6, 2012 investigative interview with co-defendant Fausto Gabriel Valdez-Cordero . . . ." *Id*. at 42–43. Appellant suggests the prosecutor placed his credibility "front and center before the jury." Appellant's Brief at 61.

This contention, as well, lacks merit. The Commonwealth maintains that Appellant knew, or should have known that Fausto Gabriel Valdez-Cordero could not identify him. During the September 19, 2012 post-sentence hearing, Agent Riley testified that he met with Fausto Gabriel Valdez-Cordero on two occasions. N.T., 9/19/12, at 33. Appellant acknowledged that he received a report of a July 21, 2011 interview of Valdez-Cordero. N.T., 10/[5]/12, at 10; Supplemental Report 47; Defense Post-Sentence Hearing Exhibit X; Commonwealth Post-Sentence Hearing Exhibit 4. The Commonwealth also provided a pretrial list of potential

Commonwealth witnesses, and Valdez-Cordero was named. Commonwealth Post-Sentence Hearing Exhibit 4. The Commonwealth asserts that Appellant was expressly advised that Valdez-Cordero could not identify him. At the October 5, 2012 continuation post-sentence hearing, the Commonwealth noted, without contradiction, that defense counsel was advised prior to trial that the Commonwealth would not be calling Fausto Gabriel Valdez-Cordero as a witness because "he's pretty squirrely and **he cannot identify your client**." N.T., 10/[5]/12, at 144–145 (emphasis added). Thus, Appellant knew prior to trial that Fausto Gabriel Valdez-Cordero had been interviewed and was on the list as a potential Commonwealth witness, but he could not identify Appellant. As our Supreme Court stated:

> It is impossible, impractical and unnecessary for the police to record every word said to or by a person during an investigation, as much of it may be irrelevant or may simply corroborate other recorded information. Further, since [the] appellant was provided with the witnesses' names, [the] appellant was free to investigate on his own by interviewing witnesses before the trial about any unrecorded conversations and by cross-examining the witnesses at trial about conversations they had with the police prior to their official statements.

*Small*, 741 A.2d at 677.

We agree with the trial court that there is no dispute that prior to trial, Commonwealth agents played the three relevant telephone recordings of Fausto Gabriel Valdez-Cordero, and Valdez-Cordero could not identify Appellant's voice or implicate Appellant in association with the "Black Widow"

ring.   Trial Court Opinion, 3/28/13, at 9 (citing N.T., 9/19/12, at 75–76, 100, 103; N.T., 10/[5]/12, at 71–72).  Valdez-Cordero's inability to identify the voice on the recordings as that of Appellant did not constitute exculpatory evidence.  "Although Fausto Gabriel Valdez-Cordero spoke to [Appellant] on the telephone, he never met Appellant and did not know his identity."  Trial Court Opinion, 3/28/13, at 9 (citing N.T., 9/19/12, at 102–103).  "He, therefore, had no basis to include or exclude Appellant as the speaker in the intercepted recordings and would not have been in a position to otherwise incriminate or exculpate [Appellant]."  Trial Court Opinion, 3/28/13, at 10.  We agree.

Based on our review of the complete record, the arguments of the parties, and the applicable law, we conclude that Appellant has failed to establish a violation of *Brady* and failed to show how the evidence, alleged to have been undisclosed, would have caused a different outcome.  *Small*; *Hutchinson*.

Judgment of sentence affirmed.

Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/11/2014

-20-